James P. **STEPHENSON**, Trustee, (02–4845) Ferris, Baker Watts, Inc., (02–3682) E*Trade Securities, LLC, (02–3711) Plaintiffs,

v.

DEUTSCHE BANK AG, et. al., (02–4845) Deutsche Bank Securities Ltd., et al., (02–3682) Deutsche Bank AG, et. al., (02–3711) Defendants.

Nos. Civ.024845(RJL/AJB), CIV023682(RJL/AJB), CIV023711(RHK/AJB).

United States District Court, D. Minnesota.

Sept. 8, 2003.

---

———

Robert L. Schnell, Jr., James L. Volling, Stephen M. Mertz, Jason K. Walbourn, Jesseca R.F. Grassley, Theodore R. Cheesebrough, Faegre & Benson LLP, Minneapolis, MN, for Plaintiff James P. Stephenson, Liquidating Trustee of MJK Clearing, Inc.

Terrence M. Fruth, Thomas E. Jamison, K. Jon Breyer, Fruth, Jamison & Elsass, P.A., Minneapolis, MN, Charles S. Fax, Richard A. Kirby, Shapiro Sher Guinot & Sandler, Washington, DC, Daniel Marino, Preston Gates Ellis & Rouvelas Meeds, Washington, DC, for Plaintiff Ferris, Baker Watts, Inc.

Terrence M. Fruth, Thomas E. Jamison, K. Jon Breyer, Fruth Jamison & Elsass, P.A., Minneapolis, MN, Marc T.G. Dworsky, Richard C. St. John, James C. Rutten, Munger Tolles & Olson LLP, Los Angeles, CA, Dennis C. Brown, for Plaintiff E*Trade Securities, Inc.

Michael J. Bleck, Michael E. Keyes, David E. Runck, Oppenheimer, Wolff & Donnelly LLP, Minneapolis, MN, James H.R. Windels, Jodi Golinsky, Michael J. Russano, Catheryn A. O'Rourke, Laura Laux Higgens, Davis Polk & Wardwell, New York, NY, for Defendants Deutsche Bank Securities Limited, Deutsche Bank Securities, Inc., and Deutsche Bank AG.

Teresa J. Kimker, Halleland Lewis Nilan Sipkins & Johnson, P.A., Minneapolis, MN, Richard M. Strassberg, Jeffrey A. Simes, Eric D. Musselman, Goodwin Procter LLP, New York, NY, for Defendant Wayne Breedon.

Madge S. Thorsen, Daniel C. Bryden, Kelly & Berens, Minneapolis, MN, Michael J. Dell, Amy Busa, Lauren Freeman–Bosworth, Jonathan M. Wagner, Kramer Levin Naftalis & Frankel LLP, New York, NY, Richard M. Sharfman, Laurence Greenwald, Michele L. Pahmer, Beth Webber, Stroock & Stroock & Lavan LLP, New York, NY, for Defendants Nomura Canada, Inc., Nomura Securities International, Inc., and Scott Reed.

J. Patrick McDavitt, Julie H. Firestone, Briggs and Morgan, P.A., Minneapolis, MN, Joel S. Forman, Karen Lee, Curtis, Mallet–Prevost, Colt & Mosle, New York, NY, for Defendant James Smith.

Jonathan M. Harris, Terrence J. Fleming, Eric J. Peck, Lindquist & Vennum P.L.L.P., Minneapolis, MN, for Defendant A.G. Edwards & Sons, Inc.

John M. Degnan, Murnane, Conlin, White & Brandt, St. Paul, MN, Dominic F. Amorosa, Amorosa Law Office, New York, NY, Michael Q. Carey, Carey & Associates, New York, NY, for Defendant Richard Evangelista. ·

**MEMORANDUM OPINION AND ORDER**

KYLE, District Judge.

**Table of Contents** [1] ■

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1041

---

[1] The appearances for the parties are attached to this Order as Appendix A.

Background........................................................1042
 I. Introduction.............................................1042
 II. The Parties .............................................1042
 A. Plaintiffs...........................................1042
 B. Defendants.........................................1043
 III. Factual Background .....................................1044
 A. Securities Lending .................................1044
 B. The Stock Manipulation Scheme .................1045
 1. The GENI Scheme .........................1046
 2. MJK Is Brought into the Transactions ........1047
 3. Fraud at Native Nations ...................1048
 4. Deutsche Bank Lessens Its Exposure ........1048
 5. The GENI for ICII Switch ..................1049
 6. Nomura Lessens Its Exposure ...............1050
 C. The Scheme Collapses ...........................1050
 IV. Procedural Background .................................1051
 A. The Amended Complaints .......................1051
 1. *James P. Stephenson v. Deutsche Bank AG, et al.,* Civ. No. 02–4845 (RHK/AJB) ........................................1051
 2. *Ferris, Baker Watts, Inc. v. Deutsche Bank Securities Limited, et al.,* Civ. No. 02–3682 (RHK/AJB) .......................1052
 3. *E\*Trade Securities, LLC v. Deutsche Bank AG,* Civ. No. 02–3711 (RHK/AJB) ........................................1052
 B. Motions Before the Court .........................1052
 1. *James P. Stephenson v. Deutsche Bank AG, et al.,* Civ. No. 02–4845 (RHK/AJB) ........................................1052
 2. *Ferris, Baker Watts, Inc. v. Deutsche Bank Securities Limited, et al.,* Civ. No. 02–3682 (RHK/AJB) .......................1053
 3. *E\*Trade Securities, LLC v. Deutsche Bank AG,* Civ. No. 02–3711 (RHK/AJB) ........................................1053

Standard of Decision ............................................1054

Analysis ........................................................1054
 I. Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b .............1055
 A. Market Manipulation .............................1056
 B. Statements and Omissions .........................1057
 C. Conclusion .......................................1058
 II. Section 20(a) of the Exchange Act of 1934 .................1058
 III. Common Law Fraud and Negligent Misrepresentation ...................1060
 A. Common Law Fraud .............................1060
 B. Negligent Misrepresentation ......................1061
 IV. Section 12(a)(1) of the 1933 Securities Act .................1062
 A. Sellers and Solicitors .............................1062
 B. Statute of Limitations ............................1064
 1. One–Year Limitations Period ...............1064
 2. Three–Year Limitations Period...............1064
 C. Sales and Defenses ...............................1065
 D. Conclusion .......................................1066
 V. Section 11 of the 1933 Securities Act......................1066
 VI. Section 9 of the Exchange Act of 1934 .....................1066
 A. Statute of Limitations ............................1067
 B. Substantive Challenges ...........................1067
 VII. Minnesota Prevention of Consumer Fraud Act ..........................1068
VIII. Civil Conspiracy .......................................1070
 IX. RICO and the Reform Act ...............................1071
 X. Personal Jurisdiction ...................................1072
 XI. Federal Rule of Civil Procedure 8(a)(2) ...................1074

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1075

## Introduction

These matters come before the Court on Defendants' motions to dismiss. In these three related actions, Plaintiffs James P. Stephenson, as trustee in bankruptcy for MJK Clearing ("the Trustee"), Ferris, Baker Watts, Inc. ("FBW"), and E*Trade Securities LLC ("E*Trade") have separately sued Defendants Deutsche Bank AG ("Deutsche Bank AG"), Deutsche Bank Securities, Inc. ("Deutsche Bank Securities"), Deutsche Bank Securities Limited ("Deutsche Bank SL"), Wayne Breedon, Nomura Canada, Inc. ("Nomura Canada"),[2] Nomura Securities International, Inc. ("Nomura"),[2] Scott Reed,[2] RBF International, Inc. ("RBF"), Kenneth D'Angelo, Richard Evangelista, GenesisIntermedia, Inc. ("GENI"),[3] Ramy El–Batrawi, Ultimate Holdings, Ltd. ("Ultimate Holdings"), Adnan Khashoggi, Bradford Keiller,[3] James Smith,[2] and A.G. Edwards & Sons, Inc. ("A.G. Edwards").[4][5]

Plaintiffs allege Defendants perpetrated or financed "a wide-ranging and sophisticated securities loan and market manipulation scheme" (Trustee Am. Compl. ¶ 1), that "resulted in the largest failure of a U.S. brokerage firm in at least 30 years" (E*Trade Am. Compl. at 1), producing "losses totaling in excess of $100 million." (FBW Am. Compl. ¶ 2.) As alleged by E*Trade:

> What makes this story shocking, even in this post-Enron era, is not the quantum of greed involved, the involvement of a headline grabbing cast of characters including the notorious Saudi arms-dealer Adnan Khashoggi, or the scent of money laundering, but rather the sheer audacity and scope of the fraud .... involv[ing] the deliberate, orchestrated participation of at least a dozen people in manipulating, again in highly coordinated fashion, the market for the securities of at least three separate companies, over a period of two years.[6]

(E*Trade Am. Compl. at 1.)

Plaintiffs assert a variety of claims against Defendants under federal and state securities law, state consumer statutes, common law, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. In response to Plaintiffs' overlapping Amended Complaints–which total almost 400 pages and 1,000 paragraphs–moving Defendants[7] have filed fifteen, sometimes du-

2. Normura, Nomura Canada, Scott Reed, and James Smith have not been sued by the Trustee.

3. GENI and Keiller have not been sued by FBW.

4. A.G. Edwards has not been sued by the Trustee or E*Trade.

5. As a general rule, the Court will follow the preferences of the parties in referring to related entities. Therefore, the Court will refer to the Deutsche Bank-related entities collectively as "Deutsche Bank," and to Nomura and Nomura Canada separately.

6. Due, in part, to novelistic prose such as this, the Amended Complaints are the subject of motions arguing that they fail to comply with the "short and plain" requirement of Fed. R.Civ.P. 8.

7. The moving Defendants are Deutsche Bank, Wayne Breedon, Scott Reed, Nomura Canada, Nomura, A.G. Edwards, and James Smith. Richard Evangelista, initially appearing *pro se*, has filed late-breaking motions in each lawsuit seeking to file motions out of time and adopting, by reference, the positions of his fellow Defendants. Evangelista's motion, however, is untimely and fails to comply with Fed.R.Civ.P. 7(b)(1), which requires that each motion "shall state with particularity the grounds therefor." Because "motion[s] giving no reasons ha[ve] no effect," *Lac du Flambeau Band of Lake Superior Chippewa*

plicative, motions to dismiss, arguing, among other things, that Plaintiffs have failed to comply with the heightened pleading requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b)(2) ("the Reform Act"), improperly pleaded conduct actionable as securities fraud as predicate acts under RICO, and failed to state claims upon which relief can be granted. For the reasons set forth below, the Court will grant Defendants' motions in part, and deny them in part.

## Background [8]

### I. Introduction

In these matters, Plaintiffs allege an orchestrated scheme involving a common practice in the securities industry known as securities lending. (Trustee Am. Compl. ¶ 4.) A typical securities lending transaction involves one party, usually a broker-dealer, loaning securities to another party, usually another broker-dealer, in exchange for cash collateral that slightly exceeds the value of the securities. (E*Trade Consol. Mem. at 6.) This cash collateral is "marked to the market," so that, as the price for a particular stock rises and falls, cash is delivered to or returned from the lender. (FBW Am. Compl. ¶ 4.)

Plaintiffs allege Defendants [9] orchestrated a sophisticated scheme in which Defendants manipulated the price of several thinly traded securities while the securities were loaned to various broker-dealers, including Plaintiffs. Because the securities were marked to the market, the rise in market price required the borrowing broker-dealers to send hundreds of millions of cash collateral upstream to the architects of the scheme. In the end, the broker-dealers were left with essentially worthless securities --- causing the massive collapse of MJK Clearing, Inc. ("MJK"), a Minnesota-based broker–dealer–while the scheme's planners ran off with the money. Plaintiffs allege that this scheme took place with the knowledge and active participation of Defendants.

### II. The Parties

#### A. Plaintiffs

Plaintiff James P. Stephenson is trustee in bankruptcy for the estate of MJK. (Trustee Am. Compl. at 1.) MJK is a Minnesota corporation with its principal place of business in Minnesota. (FBW Am. Compl. ¶ 36.) Prior to the events of the present lawsuit, it was registered with the Securities and Exchange Commission ("SEC") as a securities broker-dealer under Section 15(b) of the Securities and Exchange Act of 1934 ("the 1934 Act"). (Id.) MJK is currently in liquidation proceedings in the United States Bankruptcy Court for the District of Minnesota.

Plaintiff FBW is a Delaware corporation with its principal place of business in Washington, D.C. (FBW Am. Compl. ¶ 18.) FBW is a registered securities broker-dealer under Section 15(b) of the 1934 Act. (Id.)

Plaintiff E*Trade is a securities broker-dealer organized as a Delaware limited liability company that has its principal place of business in California. (E*Trade Am. Compl. ¶ 21.) It is the successor in interest to E*Trade Securities, Inc., which was incorporated under California law until it merged into E*Trade effective Au-

*Indians v. Wisconsin,* 957 F.2d 515, 516 (7th Cir.1992), the Court will deny Evangelista's motions.

**8.** For purposes of this motion, the Court will accept the allegations in the Amended Complaints as true.

**9.** FBW's allegations against A.G. Edwards are extremely narrow and do not, generally, include knowing or active participation in the alleged scheme.

gust 30, 2002. (*Id.*) E*Trade's parent company, E*Trade Group, Inc., is a public corporation whose stock trades on the New York Stock Exchange under the symbol ET. (*Id.*)

## B. Defendants

Defendant Deutsche Bank AG is an international bank headquartered in Frankfurt, Germany. (Trustee Am. Compl. ¶ 15.) It is one of the largest financial service providers in the world, with more than 95,000 employees, more than 2,300 branches and office locations in more than 70 countries and nearly one trillion euros in assets. (E*Trade Am. Compl. ¶ 22.) Among its numerous activities, Deutsche Bank AG operates a worldwide securities lending business managed in New York, Hong Kong, Frankfurt, and Milan. (*Id.*) It also operates a branch in Canada. (Trustee Am. Compl. ¶ 15.)

Defendant Deutsche Bank Securities–formerly known as Deutsche Bank Alex Brown, Inc.–is a securities broker-dealer headquartered in New York City with offices throughout the world. (Trustee Am. Compl. ¶ 27.) Deutsche Bank Securities is a subsidiary of Deutsche Bank. (*Id.*) As part of its broker-dealer operations, Deutsche Bank Securities conducts a securities lending business under the central control and management of Deutsche Bank. (FBW Am. Compl. ¶ 20.)

Deutsche Bank SL is a Canadian broker-dealer, with offices in various locations in Canada, that engages in securities lending and other brokerage transactions. (FBW Am. Compl. ¶ 28.) It is a wholly owned subsidiary of Deutsche Bank AG and is listed as a branch on Deutsche Bank AG's website. (*Id.*) The Amended Complaints allege that Deutsche Bank SL's securities lending activities are controlled by Deutsche Bank AG in New York and London. (*Id.*)

Defendant Wayne Breedon is a citizen of Ontario, Canada. (*Id.* ¶ 20.) Prior to being placed on administrative leave in the spring of 2002, Breedon was the employee of Deutsche Bank in Toronto responsible for initiating and controlling securities lending transactions. (Trustee Am. Compl. ¶ 16.) Breedon reported to Deutsche Bank and Deutsche Bank Securities in connection with stock loan activities involving securities issued by United States corporations. (E*Trade Am. Compl. ¶ 25.) He was formerly associated with Defendant RBF. (*Id.*)

Defendant James Smith is a citizen of New York. (FBW Am. Compl. ¶ 28.) Smith was president of Native Nations,[10] a securities firm that is the locus of much of the trading activity disputed in these lawsuits, at the time of the relevant transactions. (*Id.*)

Defendant RBF is a New Jersey corporation controlled by Defendant Kenneth D'Angelo. (Trustee Am. Compl. ¶ 30.) D'Angelo resides in Edison, New Jersey. (*Id.* ¶ 31.) RBF acts as a securities lending "finder" or broker. (*Id.*) In 1993, RBF was sanctioned by the SEC for violating tender offer rules by selling securities borrowed from Native Nations. (E*Trade Am. Compl. ¶ 29.)

Defendant Richard Evangelista is also a New Jersey resident. (Trustee Am. Compl. ¶ 32.) A former senior vice president at Native Nations, Evangelista was fired in September 2001 for allegedly falsifying Native Nations' accounts in connection with the securities loan transactions at the center of these suits. (E*Trade Am. Compl. ¶ 31.)

---

**10.** Native Nations, formerly known as Freeman Securities, Inc., is currently subject to involuntary bankruptcy proceedings in the United States Bankruptcy Court for the District of New Jersey and is therefore not named as a Defendant in these three proceedings.

Defendant GENI is a Delaware corporation with its registered address in Van Nuys, California. (Trustee Am. Compl. ¶ 33.) In the business of developing, among other things, Internet kiosks in shopping malls, its stock was offered to the public at $8.50 per share in the spring of 1999. (*Id.*) At its highest, GENI shares reached $60 per share share on a split adjusted basis. (E*Trade Am. Compl. ¶ 32.) It voluntarily delisted its stock from the NASDAQ on January 29, 2002, which now trades for pennies a share. (*Id.*)

Defendant Ramy El–Batrawi was a resident of California until October 2001. (FBW Am. Compl. ¶ 32.) El–Batrawi was the chief executive officer, chairman of the board, and a major shareholder of GENI. (Trustee Am. Compl. ¶ 34.) His whereabouts is unknown. (*Id.*)

Defendant Ultimate Holdings is a Bermuda investment company owned by Defendant Adnan Khashoggi. (FBW Am. Compl. ¶ 30.) Ultimate was a major GENI shareholder and provided securities for the stock loan transactions alleged in the Amended Complaints. (*Id.*)

Defendant Adnan Khashoggi is a Saudi financier, arms dealer, and the director and president of Ultimate Holdings. (Trustee Am. Compl. ¶ 36.) Khashoggi was a central figure in the 1986 Iran–Contra scandal whereby profits from arms sales to Iran were diverted to assist Nicaraguan rebels. (*Id.*) He is currently a fugitive from an arrest warrant issued in Thailand arising out of the collapse of the Bangkok Bank of Commerce. (FBW Am. Compl. ¶ 35.)

Defendant Bradford Keiller is a resident of Texas and Nevada. (Trustee Am. Comp. ¶ 37.) A lawyer and former strip club owner, the Complaints assert that he engaged in active day trading in order to artificially maintain the price of GENI stock. *Id.* Between February and September 2001, Keiller bought and sold more than $22 million worth of GENI stock and sent millions of dollars to Ultimate. (E*Trade Am. Compl. ¶ 36.)

Defendant Nomura is a New York corporation with its principal place of business in New York City. (FBW Am. Compl. ¶ 24.) It is a registered securities broker-dealer under Section 15(b) of the 1934 Act. (*Id.*) While Nomura is being sued by FBW and E*Trade, E*Trade's action against it has been stayed by the Southern District of New York pending the resolution of all outstanding motions in a suit between the two parties in that District.

Defendant Nomura Canada is a Canadian corporation with its principal place of business in Ontario. (E*Trade Am. Compl. ¶ 26.) Among its activities is the borrowing and lending of securities. (*Id.*) The Amended Complaints allege Nomura supervised and managed the business activities of Nomura Canada in matters related to this action. (FBW Am. Compl. ¶ 24; E*Trade Am. Compl. ¶ 27.)

Defendant Scott Reed is a citizen and resident of Ontario, Canada. (FBW Am. Compl. ¶ 25.) Reed managed Nomura Canada's stock loan department beginning in March 2001. (E*Trade Am. Compl. ¶ 28.) Prior to joining Nomura Canada in March 2001, he managed the stock loan department at Maple Securities Canada, Ltd. ("Maple Canada"). (*Id.*)

Defendant A.G. Edwards is a Delaware corporation with its principal place of business in St. Louis, Missouri. (FBW Am. Compl. ¶ 34.) It is a registered securities broker-dealer under Section 15(b) of the 1934 Act. (*Id.*)

### III. *Factual Background*

#### A. Securities Lending

Generally, broker-dealers enter into securities lending transactions for several reasons. First, such transactions provide borrowing broker-dealers with a guaran-

teed source of delivery for a stock "short-ed" by a customer. (FBW Am. Compl. ¶ 39.) Second, they provide a means to complete a securities transaction for a bor-rowing broker-dealer where the customer has failed to deliver the securities. (*Id.*) Third, broker-dealers may borrow securi-ties as a means of investing excess cash. (*Id.* ¶ 41.) Finally, these transactions can provide broker-dealers with a source of financing. (*Id.* ¶ 40.)

Securities lending takes several forms. In "conduit transactions," securities are borrowed and re-lent from one firm to another in a series of transactions or "loan-chains" before the borrowed stock arrives to the final end user. (Trustee Am. Compl. ¶ 44.) These conduit transac-tions take place for a variety of reasons, including when the lender and the end user do not have an agreement to do stock-loan business together and must route the stock through a third-party (or several third-parties) with whom both have agreements to conduct business. (*Id.*) The conduit broker-dealer earns money on the difference between the interest rate paid for the cash deposited as collateral and the cash received as collateral. (FBW Am. Compl. 42.) Securities transactions also occur as "run-throughs," in which a bro-ker-dealer who has already arranged a stock loan transaction asks a third-party broker-dealer to facilitate the transaction between broker-dealers. (E*Trade Am. Compl. ¶ 42.) Although the mechanics of these two transactions are similar, conduit broker-dealers generally have the freedom

to retain the securities, rather than on-lending them, while run-through broker-dealers do not. (*Id.* ¶ 43.)

## B. The Stock Manipulation Scheme

Plaintiffs allege that Defendants utilized these transactions to drive up the price of several thinly traded securities. While it is possible, in a typical market manipu-lation scheme, to drive up the price of thinly traded securities through phony bids, "wash sales," and other devices, it is difficult to sell large quantities of the arti-ficially inflated stock without significantly depressing the price. (Trustee Am. Compl. ¶ 6.) As alleged by Plaintiffs, De-fendants' scheme overcame that problem by purporting to "lend" the securities in question. (*Id.*) Defendants could thereby require unsuspecting broker-dealers to ad-vance cash collateral for the securities–rather than purchasing them outright–and then require additional cash collateral as Defendants artificially raised the price of the securities marked to the market. (*Id.*) Moreover, by inserting solvent broker-dealers–such as Plaintiffs–into these trans-actions as conduits and run-throughs, De-fendants were able to insulate themselves from the financial consequences when the scheme's architects ran off with the mon-ey.

Defendants relied on securities lending transactions to manipulate the supply, and thereby the price, of three securities: GENI, Imperial Credit Industries, Inc. ("ICII"),[11] and Holiday RV Superstore, Inc. ("RVEE").[12]

11. ICII is the parent company of Southern Pacific Bank and various other subsidiaries; it offers commercial and industrial financing. (*Id.* ¶ 144.) Throughout 2000 and 2001, ICII experienced serious operating losses and be-gan issuing high-yield debt, including $165.9 million of 9.875% Series B Senior Notes and $41 million of Remarketed Redeemable Par Securities. (*Id.*) On June 28, 2001, ICII com-pleted an exchange offer under which almost

all the 9.875% Notes and the Capital Trust Bonds were exchanged for new 12% Notes in the principal amount of $127.5 million. (*Id.*) All three of these bonds were the subject of securities loan transactions organized and controlled by Breedon, D'Angelo, Reed, Evan-gelista, Smith, and their associates. (*Id.*)

12. RVEE is controlled by the same principals controlling ICII. (*Id.* ¶ 167.) Deutsche Bank first acquired a position in RVEE in July

### 1. The GENI Scheme

The bulk of Plaintiffs' losses occurred in GENI securities, which resulted in losses of more than $120 million dollars for MJK Clearing and $200 million for all affected broker-dealers.[13] (Trustee Am. Compl. ¶ 49; E*Trade Am. Compl. ¶ 48.) While GENI was ostensibly an interactive technologies and Internet firm, the 1999 prospectus generated in anticipation of its initial public offering indicates that most of GENI's revenue was derived from related party transactions. (E*Trade Am. Compl. ¶ 49.) The initial public offering was for two million shares, or approximately forty-percent of the total share volume; another three million shares, of the more than four million shares remaining, stayed in the hands of Ramy El–Batrawi, GENI's founder. (Id.)

On August 12, 1999, shortly after the public trading of GENI had begun, Deutsche Bank obtained and loaned one million shares to Deutsche Bank SL in a transaction arranged by Kenneth D'Angelo, on behalf of RBF, and Wayne Breedon, on behalf of Deutsche Bank. (Trustee Am. Compl. ¶ 51.) In return for the one million shares, Deutsche Bank advanced six million dollars of cash collateral. (Id. ¶ 52.) Less than two months later, Deutsche Bank borrowed another one million shares, this time from Native Nations. (Id. ¶ 51.) Native Nations had obtained these shares from Global Leisure, a company owned by El–Batrawi, in a transaction again orchestrated by D'Angelo. (Id.) In exchange for the shares, Deutsche Bank advanced an additional four million dollars in cash collateral. (Id. ¶ 52.) Thus, within four

1999, eventually borrowing a total of four million shares. (Id.) As of November 2000, Deutsche Bank was holding all those shares directly with Native Nations. Deutsche Bank, however, quickly began moving to lessen its direct exposure to Native Nations, inserting MJK, Nomura, and Nomura Canada, among others into the lending chains. (Id.)

months of GENI's public offering, Breedon, D'Angelo, El–Batrawi, and Deutsche Bank controlled an amount of shares equal to the number of GENI's available to the public. (Id.)

Beginning in February 2000, El–Batrawi's longtime associate, Adnan Khashoggi, began to acquire GENI stock through his Bermuda-based entity, Ultimate Holdings. (Id. ¶ 54.) These shares, as with the previous GENI shares, were distributed through a stock loan chain from Native Nations to Deutsche Bank in transactions arranged by D'Angelo and RBF. (Id.) By February 31, 2000, Deutsche Bank was holding more than five million shares of GENI stock, out of a total of 6.4 million shares outstanding, and had advanced more than eighty-eight million dollars of cash collateral through Native Nations to El–Batrawi, Ultimate, D'Angelo, and others. (Id.) All of Deutsche Bank's shares originated with either Ultimate or El–Batrawi and were held as collateral for loans made by Deutsche Bank to Native Nations. (FBW Am. Compl. ¶ 83.)

With Deutsche Bank controlling virtually all of the publicly available GENI stock, El–Batrawi, Khashoggi, Keiller, and D'Angelo, began using the money advanced by Deutsche Bank to day-trade GENI to create the illusion of substantial market demand. (See E*Trade Am. Compl. ¶¶ 57–59.) For instance, on March 23, 2001, Khashoggi (through Ultimate) purchased approximately 60,000 shares of GENI and sold approximately 47,600 shares out of a total market volume of 158,100 shares

**13.** Plaintiffs allege substantially similar schemes with regard to RVEE stock and ICII bonds. Because these schemes are so similar to the GENI scheme, the Court will not outline them in detail.

traded. (*Id.* at 60.) Likewise, on July 30, 2001, D'Angelo purchased 31,500 shares of GENI and sold 12,500 shares out of a total market volume of 186,500 shares traded– about 24 percent of the total daily trading volume. (*Id.* at 59.) Through these transactions, Defendants artificially and substantially raised the price of GENI stock, causing those holding the loaned shares "marked to the market" to send large amounts of additional cash collateral down the chain of borrowers to El–Batrawi and Khashoggi. (Trustee Am. Compl. ¶ 8.)

The manipulation of the price of GENI stock was done with the full knowledge and cooperation of Wayne Breedon at Deutsche Bank. For instance, on October 6, 2000, D'Angelo told Breedon, who initiated and controlled securities lending transactions in Deutsche Bank's Toronto office:

> D'Angelo: That's what I believe in. I don't want to know about whatever. B-b-bah bah bah. I wanna know it's gonna [expletive deleted] happen. [Expletive deleted]. 'Cause in order for him to push out that eighteen and a half dollar stock, it's gotta be eighteen and a half.
>
> Breedon: Yup.
>
> D'Angelo: So they gotta run it.
>
> Breedon: Yup.
>
> D'Angelo: I think whatever the guy's thinking is, I could be wrong, but I think he should have started it today. I think his thinking was that on Monday there's not going to be a helluva a lot of people around, so it'll be easier for him to lift something with no big volume.
>
> Breedon: Yeah, that's true.

(*Id.* ¶ 57.) Likewise, Breedon was aware of the effect Deutsche Bank's substantial holdings of GENI were having on the market. On January 8, 2001, Breedon and D'Angelo discussed how Deutsche Bank's holdings were affecting short sellers:

> D'Angelo: You know there's over a million shares short?
>
> Breedon: They must just, they mustn't be shorting it just because of the FASH [Fashion Mall].
>
> D'Angelo: Well, they're just doing it because they're caught now.
>
> Breedon: Yeah.
>
> D'Angleo: He's really got them caught, in theory.
>
> Breedon: Well, yeah, I mean if there's no bloody stock out there.
>
> D'Angelo: There's none. We got five million and change [Deutsche Bank was holding more than 5 million GENI shares] and there's only 6.4 million shares outstanding.
>
> Breedon: Just buy the suckers in.
>
> D'Angelo: Yep.
>
> Breedon: Keep buying them in, buying them in.

(*Id.* ¶ 59.)

## 2. MJK Is Brought into the Transactions

While MJK, FBW, and E*Trade were all brought into the stock loan transactions as conduits or run-throughs, MJK's role was particularly critical, because it eventually served as a "hub" for most of the securities loan transactions. Since almost all of the broker-dealer lending chains would eventually pass through MJK, its eventual inability to return the cash collateral would prove devastating for its fellow intermediaries in the lending chains.

On November 10, 2000, MJK first became involved in borrowing and re-lending GENI stock. (*Id.* ¶ 70.) Thomas Brooks, the head of securities lending at MJK, received a telephone call from Evangelista,

a senior vice president of Native Nations, or those working at his direction. (*Id.*) Mr. Brooks was asked whether MJK would borrow 1,500,000 shares of GENI from Native Nations and immediately re-lend it to Maple Partners Investments, Inc. ("Maple Partners"), another broker-dealer. (*Id.*) This transaction was structured as a "run-through" transaction arranged by Breedon, at Deutsche Bank, and D'Angelo, at RBF. (*Id.*) MJK received the GENI shares and loaned them to Maple Partners, which in turn loaned them to other broker-dealers, which loaned them to Deutsche Bank. (*Id.*) In exchange for these shares, Deutsche Bank advanced $27 million in cash collateral, which passed through each broker dealer until it reached Native Nations. (*Id.*) In all likelihood, the money ended up with El–Batrawi and Khashoggi. (*Id.*)

While MJK agreed to return to its counter-party, Maple Partners, the $27 million in cash it has received as collateral when MJK lent Maple Partners the GENI stock, MJK's obligation was not dependent on its ability to receive its own collateral back from Native Nations. (*Id.* ¶ 71.) MJK was thus exposed to the risk it might owe $27 million dollars to Maple Partners, but be unable to collect the corresponding amount from Native Nations. (*Id.*)

### 3. Fraud at Native Nations

In mid-February 2001, James Smith, the president of Native Nations, learned that its auditors had discovered that Evangelista had falsified entries in Native Nations's books to make it appear as if Native Nations had borrowed the GENI stock from First Union Securities and oth-er legitimate broker dealers, rather than Ultimate and El–Batrawi. (*Id.* ¶ 74; FBW Am. Compl. ¶ 66.) Had the transactions been reflected as the consumer transactions they were, Native Nations would have been in violation of Regulation T of the Board of Governors of the Federal Reserve System, its consumer reserve requirements under SEC rule 15c3–3, 17 C.F.R. § 240.17c3–3, and its net capital requirements under SEC rule 15c3–3, 17 C.F.R. § 240.12c3–1. (*Id.* ¶ 67.) To allow its auditors to certify its financial statement, Native Nations signed a form Master Securities Loan Agreement with the Khashoggi-controlled Ultimate, which confirmed that Ultimate had loaned over five million shares of GENI to Native Nations. (Trustee Am. Compl. ¶ 74.) This Agreement, however, contained substantial falsehoods, including that Ultimate was a registered broker-dealer involved in institutional stock lending, which it was not, and the transactions it had effected complied with all applicable laws and regulations. (*Id.*; FBW Am. Compl. ¶ 66.) Smith never reported the auditors' discoveries to the SEC, any regulatory body, or MJK. (Trustee Am. Compl. ¶ 74.) Evangelista kept his job. (FBW Am. Compl. ¶ 68.)

### 4. Deutsche Bank Lessens Its Exposure

Soon after Native Nations' auditors found the false entries on its books and records, Deutsche Bank SL reduced its credit limits with Native Nations and began to systematically reduce its direct stock-loan position with Native Nations on GENI stock.[14] (Trustee Am. Compl. ¶ 78.)

---

**14.** Deutsche Bank was aware of Native Nations' precarious financial position and participated in efforts to cover it up. From October 1999 through June 2001, Deutsche Bank made significant transfers of cash, often one million dollars or greater, to allow Native Nations month-end net capital positions, filed pursuant to SEC and NASD rules, to appear more positive than they were. (Trustee Am. Compl. ¶¶ 165–67.) The money from these transfers was generally transferred from Deutsche Bank to Native Nations at the end

To that end, Deutsche Bank took care to insert solvent broker-dealers into the lending chains between Native Nations and itself. (*Id.*) During the spring and summer of 2001, Deutsche Bank returned large quantities of stock to Native Nations, which then routed it back to itself through a variety of broker-dealers, including Wells Fargo, First Southwest Securities, Nomura, Nomura Canada, Robert W. Baird & Company, HSBC Group Canada, E*Trade, and, eventually, Fiserv. (FWB Am. Compl. ¶ 99.)

In March 2001, Thomas Brooks at MJK was contacted by Breedon, D'Angelo, or their associates to discuss increasing MJK's borrowing of GENI stock by almost a million shares. (*Id.*) By then, MJK's borrowing had increased to one-and-three-quarters million shares, so that with the additional shares, MJK's total borrowing of GENI would exceed two-and-a-half million shares. (*Id.*) Brooks agreed to the transaction. From March until June 2001, MJK's borrowing of GENI shares from Native Nations continued to grow until it reached 10,111,400 shares on June 30, 2001, as adjusted for a three-for-one stock split. (*Id.* ¶ 81.) During this period, MJK advanced cash collateral of $192,116,600 to Native Nations. (*Id.*) Virtually all of it was funneled to Khashoggi and El-Batrawi.

Scott Reed, the head of securities lending for Maple Partners' Canadian affiliate, Maple Securities Canada ("Maple Canada"), interposed both Maple Partners and Maple Canada between MJK and Deutsche Bank in transactions involving GENI, RVEE, and ICII. For example, in the November 10, 2000 transaction that inaugurated MJK's participation in the stock lending chains, Native Nations loaned one-and-a-half million shares of GENI to MJK, which loaned the shares to Maple Partners, which in turn loaned the

shares to Maple Canada, which finally loaned the shares to Deutsche Bank. (FBW Am. Compl. ¶ 91.) In exchange for the shares, Deutsche Bank advanced $27 million in cash collateral up the lending chain to Native Nations. (*Id.*) Similarly, on December 19, 2000, Native Nations loaned 250,000 shares of GENI to MJK, and through MJK to Maple Partners, Maple Canada, and finally Deutsche Bank. (*Id.*) In return, Deutsche Bank advanced $4,500,000 in cash collateral up the chain. (*Id.*) As a result of those transactions, Maple Partners and Maple Canada had open positions of one-and-three-quarters million shares of GENI–a figure representing 128% of the outstanding shares in the hands of the public. (E*Trade Am. Compl. ¶ 92.)

In early March 2001, Scott Reed's superiors at Maple Canada informed him that they were concerned about the size of their position on securities borrowed through MJK and they instructed him to reduce their MJK positions by ten million dollars. (*Id.* ¶ 93.) Rather than acquiesce, Reed increased his positions by twenty million dollars. (*Id.*) He told Breedon that this would "probably get him called into the office" and began looking for other work. (*Id.*) On March 12, 2000, Reed resigned from Maple Canada to accept a position with Nomura Canada. (*Id.* ¶ 95.) Maple Partners and Maple Canada completely closed out their positions in GENI, ICII, and RVEE; Reed, however, worked quickly with Breedon and D'Angelo to reconstitute those positions with his new employer. (*Id.* ¶ 97.) By March 27, 2001, Nomura and Nomura Canada had borrowed and re-loaned well over two-and-a-half million GENI shares. (*Id.* ¶ 98.)

### 5. The GENI for ICII Switch

In June 2001, D'Angelo, Breedon, and Reed decided to reorganize the structure

of the month, and then returned a few days later. (*Id.*)

of the lending chains that had developed with regard to ICII bonds. (*Id.* ¶ 99.) Because Deutsche Bank's Canadian branch owned such a large position that it essentially "own[ed] the entire company" and would have to pay substantial non-resident taxes, Reed agreed to route the bonds to Nomura. (*Id.*) Reed, however, was internally warned that such a move would almost certainly be illegal. (*Id.* ¶ 106.) Therefore, Breedon and Reed concocted a plan by which the ICII bonds would essentially be traded for GENI stock, of which Breedon laughingly noted, "we have a ton of." (*Id.* ¶ 107.) The ICII for GENI trade was implicitly premised on the fact Native Nations or MJK would be unable to return its cash collateral. (*Id.*) As Reed explained when asked by Nomura's reorganization department why he was pursuing this complex stock-for-bond swap rather than simply returning the ICII bonds: "[T]he idea is they need cash." (*Id.* ¶ 108.)

### 6. Nomura Lessens Its Exposure

At that point, Nomura and Nomura Canada had exhausted their available credit with MJK. (*Id.* ¶ 100.) Moreover, Reed wanted to minimize Nomura and Nomura Canada's direct position with MJK. (*Id.*) As Thomas Brooks of MJK testified in a related proceeding, "I can remember Nomura wanted to keep the shares on but not with [MJK] directly. At that point I needed to find somebody who [MJK] could loan it to and [Nomura] could borrow from. We decided that was E*Trade." (*Id.* ¶ 101.)

At Nomura's behest, on June 21, 2001 Brooks asked Donald Santina, of E*Trade's stock loan department, to perform a run-though, borrowing 2,455,000 post-split shares of GENI, at $17 a share, and immediately re-loaning those shares to Nomura; in exchange, E*Trade would receive and redeliver $41,735,000 in cash collateral from Nomura to MJK. (*Id.* ¶ 102.) E*Trade's fee would be 12.5 basis points,

calculated as the difference between the 5.125% rebate rate E*Trade charged on the cash it delivered to MJK and the 5% rate it charged Nomura. (*Id.*) E*Trade agreed to the deal. (*Id.*) Two months later, E*Trade performed a similar run-through involving 1,655,000 post-split shares of GENI and cash collateral of almost $30 million, this time between MJK and Wedbush at the behest of Deutsche Bank. (*Id.* ¶ 104.) Through these two transactions, Nomura and Deutsche Bank reduced their direct position with MJK by more the $70 million.

### C. The Scheme Collapses

During the several months prior to September 11, 2001, GENI traded consistently at a price of $17 per share or greater, due in large part to the efforts of various Defendants to prop up · the stock price. (FBW Am. Compl. ¶ 170.) Following the September 11 attacks, the price of GENI fell precipitously, from $17 a share to $9 a share in the week after the stock markets reopened on September 17. (Trustee Am. Compl. ¶ 97.) Each broker-dealer within the lending chain was forced to mark to the market daily. (FBW Am. Compl. ¶ 172.) As the price plummeted, Deutsche Bank was thereby able to recover large amounts of cash collateral from the broker-dealers directly above it in the lending chain. (*Id.*)

D'Angelo, Evangelista, and Smith knew that if marks were made to Native Nations, Native Nations would be unable to pay them. (*Id.* ¶ 173.) Accordingly, D'Angelo persuaded MJK's Brooks not to mark Native Nations, but rather to pay downstream marks out of MJK's own capital, and that RBF would reimburse MJK for its costs. (*Id.*) Accordingly, by the morning of September 21, 2001, MJK had paid downstream broker-dealers in excess of $50 million in cash collateral relating to

GENI stock and $20 million cash collateral for the ICII bonds without receiving any money from Native Nations. (*Id.*) MJK was on the verge of financial collapse. (*Id.*)

At Nomura Canada, Scott Reed was under substantial pressure to drastically cut his four million share position in GENI stock. (*Id.* ¶ 176.) Reed told Breedon that he thought he could get away with only reducing that position by half; Reed and Breedon joked that Nomura's management would not be able to locate the stock on Nomura's own books because of the complexity of the underlying transactions. (*Id.*) In order to avoid having Nomura return all of its shares, Breedon, D'Angelo and Reed formulated a plan by which they would move half of Nomura's GENI position from Deutsche Bank Canada through Nomura Canada to MJK, and then back to Deutsche Bank from MJK through FBW and A.G. Edwards. (*Id.* ¶ 178.) Breedon was frantic to make sure this transfer took place and placed no fewer than 25 phone calls to both the plan participants and A.G. Edwards to ensure the stock was safely rerouted to Deutsche Bank. (*Id.* ¶ 182.)

At this stage, however, the scheme's collapse was inevitable. On September 25, 2001, Native Nations and MJK notified regulatory authorities that they lacked sufficient capital under federal and self-regulatory rules to continue operations and closed their doors. (*Id.* ¶ 185.) Broker-dealers up the lending chain felt the reverberations. Acting on the instructions of his superiors, Breedon promptly returned all the shares of GENI held that Deutsche Bank had in its possession on the morning of September 26; he was successful with regard to all shares, save for those few still held directly with Native Nations. (*Id.* ¶ 186.)

In the end, Deutsche Bank recouped approximately $120,800,000 of the $123,300,000 it had outstanding.[15] (E*Trade Am. Compl. ¶ 185.) In Breedon's words, "[O]ther people are probably stuck with it, but not us." (*Id.*) Reed's machinations of the prior week permitted Nomura and Nomura Canada to do almost as well, clearing $28 million worth of GENI positions. (*Id.* ¶ 187.) Intermediaries such as MJK Clearing, FBW, and E*Trade were left with millions of shares of worthless stock. As Reed said of the intermediaries, "Now they're the one that's going to get f—cked, right?" (*Id.* ¶ 186.)

## IV. Procedural Background

### A. The Amended Complaints

#### 1. *James P. Stephenson v. Deutsche Bank AG, et al.*, Civ. No. 02–4845 (RHK/AJB).

The Trustee commenced his action as an adversarial proceeding in the United States Bankruptcy Court for the District of Minnesota. The matter was then transferred to this Court on December 19, 2002.

The Trustee has sued Defendants Deutsche Bank AG, Deutsche Bank Securities, Deutsche Bank SL, Wayne Breedon, RBF, Kenneth D'Angelo, Richard Evangelista, GENI, Ramy El–Batrawi, Ultimate Holdings, Adnan Khashoggi, Bradford Keiller, and John Does 1–10.

The Amended Complaint asserts sixteen causes of action. Counts I through X are brought under federal and state securities law and are premised on alleged fraud and manipulation in connection with securities lending transactions. (*See* Trustee Am. Compl. ¶¶ 149–243.) Counts XI through XIII, sometimes pleaded in the alternative

---

**15.** FBW's Amended Complaint puts those figures at about half the amounts cited in

E*Trade's Amended Complaint.

and sometimes not, allege violations of RICO based on the same activity. (*See id.* ¶¶ 244–58.) Counts XIV, alleging common law fraud, XV, alleging violations of the Minnesota Consumer Protection Act, and XVI, alleging conspiracy, are all also premised on the securities lending transactions. (*See id.* ¶¶ 261–64, 268–71, 275.)

The Trustee alleges damages of more than $335,000,000. (Trustee Am. Compl. ¶ 1.)

### 2. *Ferris, Baker Watts, Inc. v. Deutsche Bank Securities Limited, et al.,* Civ. No. 02–3682 (RHK/AJB).

FBW filed its action on September 20, 2002. FBW has sued Defendants Deutsche Bank SL, Deutsche Bank Securities, Deutsche Bank AG, Wayne Breedon, Nomura, Nomura Canada, Scott Reed, RBF, Kenneth D'Angelo, James Smith, Richard Evangelista, Ultimate Holdings, Adnan Khashoggi, Ramy El–Batrawi, and A.G. Edwards. (FBW Am. Compl. ¶ 1.)

FBW's Amended Complaint asserts twenty-two causes of action. Counts I through XVI, XVIII, and XIX are brought under federal and state securities law and are premised on alleged fraud and manipulation in securities lending transactions. (*See id.* ¶¶ 193–284, 296–310.) Counts XVII, alleging common law fraud, and XX, alleging negligent misrepresentation, and XXI, alleging civil conspiracy, assert that the stock loan transactions were in furtherance of a common scheme and that each Defendant agreed to participate. (*Id.* ¶¶ 312, 319.) Finally, Count XXII, pleaded in the alternative, alleges violations of the RICO statute through a pattern of racketeering activity generated by multiple acts of wire fraud. (*Id.* ¶¶ 323–25.)

FBW seeks damages of approximately $18 million. (*Id.* ¶ 1.)

### 3. *E\*Trade Securities LLC v. Deutsche Bank AG,* Civ. No. 02–3711 (RHK/AJB).

E\*Trade commenced its action on September 25, 2002. E\*Trade has sued Defendants Deutsche Bank AG, Deutsche Bank Securities, Deutsche Bank SL, Wayne Breedon, Nomura Canada, Nomura, Scott Reed, RBF, Kenneth D'Angelo, Richard Evangelista, GENI, Ramy El–Batrawi, Ultimate Holdings, Adnan Khashoggi, Bradford Keiller, James Smith, and John Does Nos. 2–100.[16] (E\*Trade Am. Compl. ¶ 1.)

E\*Trade's Amended Complaint sets forth seventeen causes of action. Counts I through XI are brought under federal and state securities laws and premised on the alleged fraud and manipulation in securities lending transactions. (*Id.* ¶¶ 193–312.) Counts XII–XIV, sometimes pleaded in the alternative and sometimes not, allege violations of RICO. (*Id.* ¶¶ 313–327.) Counts XV, alleging common law fraud, XVI, alleging violations of the Minnesota Consumer Protection Act, and XVII, alleging civil conspiracy, are all based on the same underlying conduct. (*Id.* ¶¶ 329–345.)

E\*Trade seeks damages of approximately $20 million, in addition to any amounts it might be required to pay in related litigation. (*Id.* ¶ 192.)

### B. Motions Before the Court

The Court presently has before it a multitude of Motions to Dismiss and other related Motions in these three actions. Those Motions are:

### 1. *James P. Stephenson v. Deutsche Bank AG, et al.,* Civ. No. 02–4845 (RHK/AJB).

16. James Smith, added in the Amended Complaint, was John Doe No. 1.

- Motion by Deutsche Bank to Dismiss Counts IV, XI, XII & XIII of the Amended Complaint [Doc. No. 28];
- Motion by Defendant Wayne Breedon to Dismiss Plaintiff's Amended Complaint Pursuant to Fed.R.Civ.P. 8 and 12(f) [Doc. No. 35];
- Motion by Defendant Wayne Breedon to Dismiss Counts I, IV, VIII, IX, XII, XIII, XIV and XV of the Amended Complaint [Doc. No. 39];
- Motion by Defendant Richard Evangelista for Leave to File Motion Out of Time and for Order to Join Co–Defendants' Motions [Doc. No. 61];

 2. **Ferris, Baker Watts, Inc. v. Deutsche Bank Securities Limited, et al.,** Civ. No. 02–3682 (RHK/AJB).

- Motion by Defendant James Smith to Dismiss the First Amended Complaint for Lack of Personal Jurisdiction, Failure to State a Claim on Which Relief Can Be Granted, and Failure to Plead Fraud with Particularity [Doc. No. 72];
- Motion by Defendant Wayne Breedon to Dismiss Plaintiff's Amended Complaint Pursuant to Fed.R.Civ.P. 8 and 12(f) [Doc. No. 103];
- Motion by Defendants Nomura and Nomura Canada to Dismiss the Complaint [Doc. No. 86];
- Motion by Defendant Scott Reed to Dismiss First Amended Complaint [Doc. No. 89];
- Motion by Deutsche Bank Defendants to Dismiss Count XXII of the Amended Complaint [Doc. No. 81];
- Motion by Defendant Wayne Breedon to Dismiss Counts I, VII, XVII, XVIII, and XXII of Plaintiff's Amended Complaint [Doc. No. 105];

- Motion to Dismiss by Defendant A.G. Edwards [Doc. No. ___];
- Motion by Plaintiff Ferris, Baker Watts to Strike Portions of Defendants' Nomura, Nomura Canada and Scott Reed Reply Briefs [Doc. No. 111];
- Motion by Defendant Richard Evangelista for Leave to File Motion Out of Time, and for Order to Join Co–Defendants' Motions [Doc. No. 125];

 3. **E\*Trade Securities LLC v. Deutsche Bank AG,** Civ. No. 02–3711 (RHK/AJB).

- Motion by Defendants Deutsche Bank AG, Deutsche Securities, and Deutsche Bank SL to Dismiss Counts VII, XII, XIII, and XIV of Plaintiff's Amended Complaint [Doc. No. 71];[17]
- Motion by Defendant Wayne Breedon to Dismiss Plaintiff's Amended Complaint Pursuant to Fed.R.Civ.P. 8 and 12(f) [Doc. No. 80];
- Motion by Defendant Wayne Breedon to Dismiss Counts I, VII, IX, X, XII, XIII, XIV, XV, and XVI of Plaintiff's Amended Complaint [Doc. No. 82];
- Motion by Defendant Nomura Canada to Dismiss the First Amended Complaint [Doc. No. 87];
- Motion by Defendant Scott Reed to Dismiss the Amended Complaint [Doc. No. 90];
- Motion by Plaintiff E\*Trade to Strike Portions of Defendants Nomura, Nomura Canada, and Scott Reed's Reply Briefs [Doc. No. 101];
- Motion by James Smith to Dismiss the Amended Complaint for Failure to State a Claim on Which Relief Can Be Granted, Lack of Personal Jurisdic-

---

17. Since filing their motions, Defendants Deutsche Bank and Breedon have settled with E\*Trade. Accordingly, those motions are moot and the Court will dismiss E\*Trade's Amended Complaint against those Defendants.

tion, and Failure to Plead Fraud with Particularity [Doc. No. 109];

· Motion by Defendant Richard Evangelista for Leave to File Motion Out of Time, and for Order to Join Co–Defendants' Motions [Doc. No. 120].

### Standard of Decision

"Dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and destined to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 627 (8th Cir.2001). A cause of action "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 740 (8th Cir.2002) (internal citations omitted) (citing *Kohl v. Casson*, 5 F.3d 1141, 1148 (8th Cir.1993)). In analyzing the adequacy of a complaint's allegations under Rule 12(b)(6), the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from those allegations. *See Turner v. Holbrook*, 278 F.3d 754, 757 (8th Cir.2002).

### Analysis

The Trustee, FBW, and E*Trade have "tossed everything in the kitchen, including the sink, at [Defendants]," *Hunt–Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1004 (7th Cir.1997) (Evans, J.), including: (1) Section 10(b) of the Exchange Act of 1934 and Rule 10b–5 promulgated thereunder; (2) Section 20 of the Exchange Act of 1934; (3) Section 80A of the Minnesota Securities Act; (4) Common Law Fraud and Negligent Misrepresentation; (5) 12(a)(1) of the 1933 Securities Act; (6) Section 11 of the 1933 Securities Act; (7) Section 9 of the 1934 Exchange Act; (8) the Minnesota Consumer Fraud Act; (9) Civil Conspiracy; and (10) Racketeer Influenced and Corrupt Organizations Act (RICO).[18] Defendants have challenged each of these causes of action on a variety of grounds, and have several more general defenses, including lack of personal jurisdiction over Scott Reed and James Smith, and failure to comply with Rule 8(a) of the Federal

18. The Trustee and E*Trade have also asserted claims for damages under Section 13(d) of the Exchange Act of 1934 ("Section 13(d)"), 15 U.S.C. § 78m(d), and SEC Rule 13d–101 ("Rule 13d–101"), 17 C.F.R. § 240.13d–101. Section 13(d)(1) provides that any person acquiring five percent or more of the shares of any company registered under Section 12 of the Exchange Act, 15 U.S.C. § 78*l*, must file a Schedule 13D Statement. Under Rule 13d–101, the Schedule 13D must disclose, among other things, "the purpose or purposes of the acquisition" including any "plans or proposals" which the acquirer may have relating to, or resulting in, the acquisition of additional securities of the corporation or the disposition of securities of the corporation. 17 C.F.R. § 240.13d–101.

Courts, however, have almost universally held that Section 13(d) does not contain a private right of action for money damages.

*See, e.g., Hallwood Realty Partners v. Gotham Partners*, 286 F.3d 613, 619 (2d Cir.2002) (holding that "there is no private damages remedy for issuers under § 13(d)."); *Kamerman v. Steinberg*, 891 F.2d 424, 430 (2d Cir. 1989) ("One complaining of a false or misleading statement in a schedule 13D may seek damages only under Section 18(a) of the Act."); *Sanders v. Thrall Car Mfg. Co.*, 582 F.Supp. 945, 960 (S.D.N.Y.1983) (noting that "courts have consistently refused to imply private rights of action for damages under § 13(d)"), *aff'd*, 730 F.2d 910 (2d Cir.1984).

Confronted with this overwhelming case law, the Trustee and E*Trade have concluded that discretion is the better part of valor and have withdrawn their claims for money damages under Section 13(d). Accordingly, the Court will grant Defendants' motions as to these claims.

Rules of Civil Procedure. The Court will address each of these issues in turn.

## I. Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b–5

The Trustee, FBW, and E*Trade have brought claims against all Defendants, save A.G. Edwards, under Section 10(b) of the 1934 Act ("Section 10(b)"), 15 U.S.C. § 78j(b), and SEC Rule 10b–5 ("Rule 10b–5"), 17 C.F.R. § 240.10b–5. (*See* Trustee Am. Compl. ¶¶ 149–164; FBW Am. Compl. ¶¶ 193–201; E*Trade Am. Compl ¶¶ 193–211.) Under Section 10(b), it is unlawful for any person, "directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe. . . ." 15 U.S.C. § 78j(b). Section 10(b) is not limited to a purchaser or seller of securities, but rather "reaches any deceptive device used 'in connection with the purchase or sale of any security.'" *Id.* (quoting 15 U.S.C. § 78j(b)).

■ Rule 10b–5, adopted by the SEC pursuant to its rulemaking authority, states that "[i]t shall be unlawful for any person, directly or indirectly,"

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Rule 10b–5 is coextensive in scope with Section 10(b). *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976);

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

■ While allegations of fraud are generally subject to the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, certain aspects of Section 10(b) and Rule 10b–5 fall under special pleading standards of the Reform Act. Under that Act, a complaint based on statements or omissions under Rule 10b–5(b) must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u–4(b)(1). Cases, such as market manipulation cases, under Rule 10b–5(a) and (c) that are not based on statements are not subject to this requirement. *In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 335 (S.D.N.Y.2003). Moreover, the Reform Act also requires that complaints alleging Section 10(b) and Rule 10b–5(b) violations "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind" respecting "each act or omission alleged to violate" these rules. 15 U.S.C. § 78u–4(b)(2) (emphasis added). Finally, it is the plaintiff's burden to "prov[e] that the act or omission of the defendant alleged to violate [Section 10(b) or Rule 10b–5] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).

Plaintiffs have alleged that Defendants (1) engaged in market manipulation in violation of 10b–5(a) and (c), and (2) made misleading statements and omissions in violation of Rule 10b–5(b). Defendants focus almost exclusively on the sufficiency of Plaintiffs' claim that Defendants made misleading statements and omissions. Liabili-

ty under *any* subsection of Rule 10b–5, however, is sufficient to establish a violation of the rule, and the Court concludes Plaintiffs Rule 10b–5 claims are properly pleaded.

### A. Market Manipulation

Plaintiffs allege that Defendants manipulated the market for GENI, HVEE, IICE securities in violation of Rule 10b–5(a) and (c). Subsections (a) and (c) forbid any person from "directly or indirectly" employing a "device, scheme or artifice to defraud," or from engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(a), (c). While Rule 10b–5(b) requires a statement or omission, "the first and third paragraphs are not so restricted." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152–53, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

■ To state a market manipulation claim under Rule 10b–5(a) and (c), plaintiffs must allege: (1) that they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by the defendant's deceptive and manipulative conduct; and (5) that the defendant engaged in the manipulative conduct with scienter. *In re Blech Sec. Litig.*, 961 F.Supp. 569, 582 (S.D.N.Y. 1997) (*Blech II* ) (citing *Ernst & Ernst*, 425 U.S. at 199, 96 S.Ct. 1375); *In re IPO*, 241 F.Supp.2d at 385; *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 579 (S.D.Tex.2002); *In re Sterling Foster & Co., Inc. Sec. Litig.*, 222 F.Supp.2d 289, 303–04 (E.D.N.Y.2002). Plaintiffs also must plead "loss causation" by alleging that the "act or omission of the defendant alleged to violate [Rule 10b–5] *caused* the loss for which the plaintiff

seeks to recover damages." 15 U.S.C. § 78u–4(b)(4) (emphasis added).

■ While Defendants largely ignore Plaintiffs' detailed market manipulation claims, they do argue that Plaintiffs have failed to plead scienter with the specificity required by the Reform Act. Under the Reform Act, "the complaint shall, with respect to each act or omission alleged to violate [Section 10(b) ], state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). The Court therefore views the Complaints "to determine whether they set forth facts that give a *strong* reason to believe that there was a reckless or intentional wrongdoing." *In re Navarre Corp.*, 299 F.3d 735, 745 (8th Cir.2002) (emphasis added).

The Eighth Circuit has identified three methods of establishing scienter. First, scienter may be established from facts demonstrating "a mental state embracing intent to deceive, manipulate, or defraud." *In re K–tel Intern., Inc. Sec. Litig.*, 300 F.3d 881, 893 (8th Cir.2002) (quoting *Ernst & Ernst*, 425 U.S. at 193 n. 12, 96 S.Ct. 1375). Second, while allegations of negligent conduct are not sufficient, *Hochfelder*, 425 U.S. at 215, 96 S.Ct. 1375, conduct which rises to the level of severe recklessness may be sufficient to meet the scienter requirement. *K & S P'ship v. Continental Bank, N.A.*, 952 F.2d 971, 978 (8th Cir. 1991). Sufficient conduct is limited to "highly unreasonable omissions or misrepresentations" involving "an extreme departure from the standards of ordinary care, and . . . present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (citing *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985)). Finally, a party may allege oppor-

tunity and an "unusual or heightened motive." *In re K–Tel,* 300 F.3d at 893. Without a showing of motive or opportunity, "other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 660 (8th Cir.2001).

■ Here, Plaintiffs have alleged facts that give rise to a strong inference that Defendants acted intentionally. The detailed, complicated scheme alleged by Plaintiffs as to each moving Defendant evinces "a mental state embracing intent to deceive, manipulate, or defraud." *In re K–Tel,* 300 F.3d at 893. "Plaintiffs have satisfied the [strong inference inquiry] for a simple reason: They have alleged that [defendants] engaged in ... deliberately illegal behavior ... [that does] not happen accidentally, negligently, or even recklessly." *In re IPO,* 241 F.Supp.2d at 385. Plaintiffs have identified with precision the opportunities Defendants had to engage in the scheme, their pecuniary motive, and how the scheme was carried out. Such pleading is more than sufficient to establish scienter, even under the heightened standards of the Reform Act. Consequently, the Court finds that Plaintiffs' market manipulation claims under Rule 10b–5(a) and (c) are properly pleaded.

## B. Statements and Omissions

■ Plaintiffs have also alleged violations of Rule 10b–5(b). Under subsection (b), it is illegal "[t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To state a claim under 10b–5(b), Plaintiffs must allege: (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security. *In re K–Tel,* 300 F.3d at 888.

■ Statements and omissions alleged to violate subsection (b) and scienter are subject to the pleading standards of the Reform Act. 15 U.S.C. § 78u–4(b)(1)–(2). Therefore, in addition to the heightened standards for scienter detailed above, the Amended Complaints must "specify each false statement or misleading omission and explain why the omission was misleading." *In re Navarre,* 299 F.3d at 742.

■ Here, Plaintiffs have properly alleged material omissions, if not statements, made in furtherance of the scheme to defraud.[19] While Defendants launch a fusillade of challenges to the sufficiency of those allegations under subsection (b), Plaintiffs' proper allegations of market manipulation are, in fact, dispositive as to their claims of material omissions:

> Where a defendant has engaged in conduct that amounts to "market manipulation" under Rule 10b–5(a) or (c), that misconduct creates an independent duty to disclose. Failure to do so thus gives rise to a violation of Rule 10b–5(b). This is so because participants in the securities markets are entitled to presume that all of the actors are behaving legally; silence that conceals illegal activity is therefore intrinsically misleading and (presuming the illegality is also

19. While Plaintiffs argue, in essence, that Defendants *must* have uttered misleading statements, that is simply insufficient to comply with the heightened pleading standards of the Reform Act. *See* 15 U.S.C. § 78u–4(b)(1) ("[T]he complaint shall specify each statement alleged to have been misleading....").

material) is always violative of Rule 10b–5(b).

*In re IPO*, 241 F.Supp.2d at 381–382. This result flows from Section 10(b)'s objective "to insure honest securities markets and thereby promote investor confidence," *United States v. O'Hagan*, 521 U.S. 642, 658, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), and the Court's ongoing obligation to construe the statute "not technically and restrictively, but flexibly to effectuate its remedial purpose," *Securities and Exchange Comm'n v. Capital Gains Research Bureau. Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). As alleged by Plaintiffs, Defendants "have perpetrated a double fraud: they have manipulated the market and they have covered it up with … omissions. This conduct gives rise to liability under every section of Rule 10b–5." *In re IPO*, 241 F.Supp.2d at 382.

Even if Plaintiffs' market manipulation allegations were only sufficient to establish a *duty* to disclose the fraudulent scheme, Defendants' arguments would still fail. While Defendants assert that they should escape Rule 10b–5 because they did not make any statements "directly" to Plaintiffs, this ignores the plain language of Rule 10b–5 premising liability on statements or omissions made "directly or *indirectly.*" 17 C.F.R. § 240.10b–5 (emphasis added). Likewise, Defendants' argument that Plaintiffs have failed to plead reliance fails to acknowledge the Eighth Circuit's holding that reliance is not an element of a Rule 10b–5 claim, but is rather a means of establishing transaction causation. *See In re K–Tel*, 300 F.3d at 888. Because Plaintiffs have alleged that they "would not have purchased the security but for defendant's [fraud], or that they would have purchased it at a lower price," *Arthur Young v. Reves*, 937 F.2d 1310, 1327–28 (1991), they have established transaction causation. Finally, the Court finds little to recommend the argument that the events of September 11, 2001, rather than the fraudulent scheme alleged, caused Plaintiffs' losses. While the steep market decline accompanying the terrorist attacks helped speed the scheme's collapse, Plaintiffs have alleged a causal "nexus between the defendants' fraudulent conduct and the plaintiff's pecuniary loss." *Harris v. Union Elec. Co.*, 787 F.2d 355, 366 (1986). Thus, they have alleged loss causation.

The Amended Complaints plead facts sufficient to establish a duty to disclose, a breach of that duty, transaction causation, loss causation, and scienter. The Court concludes that Plaintiffs have therefore stated a claim for material omissions under Rule 10b–5(b).

### C. Conclusion

Having pleaded violations of *each* of Rule 10b–5's subparagraphs, Plaintiffs have stated a claim upon which relief can be granted with the specificity required by Fed.R.Civ.P. 9(b) and the Reform Act. Therefore, the Court will deny Defendants' Motions to Dismiss, insofar as they relate to Section 10(b) or Rule 10b–5.[20]

### II. Section 20(a) of the Exchange Act of 1934

 FBW and E*Trade have alleged that various Defendants, including

---

**20.** Plaintiffs also allege that Defendants violated Minn.Stat. § 80A.01, the state counterpart to Section 10(b) and Rule 10b–5. Because "the substantive requirements are the same," *see, e.g., First Presbyterian Church v. John G. Kinnard & Co.*, 881 F.Supp. 441, 446 (D.Minn.1995), Plaintiffs' claims under Minn. Stat. § 80A.01 are also valid for reasons stated above. While the Nomura-related Defendants assert that the Minnesota Securities Act should not apply to them, the relevant transactions are alleged to have been funneled through MJK in Minnesota. Therefore, the Minnesota Securities Act applies. *See* Minn. Stat. § 80A.01 (statute may be invoked when offer to deal is directed to Minnesota offeree.)

Deutsche Bank, Nomura, Nomura Canada, and Smith, are "controlling persons" under Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t. Section 20(a) extends liability to those persons that control violators of Section 10(b). 15 U.S.C. § 78t. As the Eighth Circuit has held,

> [A] control person relationship exists whenever (i) the alleged control person actually exercised control over the general operations of the primary violator and (ii) the alleged control person possessed–but did not necessarily exercise–the power to determine the specific acts or omissions upon which the underlying violation is predicated.

*Farley v. Henson,* 11 F.3d 827, 835 (8th Cir.1993); *see also Metge v. Baehler,* 762 F.2d 621, 624 (8th Cir.1985). The control-person statute is "remedial and is to be construed liberally. It has been interpreted as requiring only *some indirect means of discipline or influence* short of actual direction to hold a 'controlling person' liable." *Farley,* 11 F.3d at 836 (emphasis added) (citing *Myzel v. Fields,* 386 F.2d 718, 738 (8th Cir.1967)).

Smith, Nomura, and Nomura Canada have moved to dismiss this cause of action on two grounds. First, they argue that Plaintiffs have failed to establish a primary violation of Rule 10b–5; in other words, because there was no primary violation of the rule, moving Defendants cannot be held liable for controlling a primary violator. Second, these Defendants assert that, even if the Court finds Plaintiffs have stated Rule 10b–5 claims, the allegations regarding control are conclusory.

■ The Court finds that control of a primary violator has been pleaded as to Nomura and Nomura Canada, but not as to Smith. As stated above, Plaintiffs have properly stated Rule 10b–5 claims against Reed and Nomura Canada, alleged to be primary violators under the control of Nomura Canada and Nomura.[21] Smith, however, properly points out that no party has asserted claims against Native Nations, and therefore Native Nations cannot be a "person *liable* under [Rule 10b–5]". 15 U.S.C. § 78t(a) (emphasis added). While FBW has alleged that Native Nations violated Rule 10b–5 (*see* FBW Am. Compl. ¶¶ 218–21), it must be able to establish Native Nation's *liability* to bring Smith within the ambit of Section 20(a). Because Native Nations has not been charged with a Rule 10b–5 violation in the these matters–and has not been found liable in any other forum–FBW cannot claim that Smith possesses control person liability under the statute.

■ Smith, Nomura, and Nomura Canada also argue that the Section 20(a) claims are defective because the Amended Complaints offer only conclusory allegations regarding control. Section 20(a), however, is not subject to the heightened pleading standards of either the Reform Act or Fed.R.Civ.P. 9(b). *In re IPO,* 241 F.Supp.2d at 397 n. 185. Consequently, "[n]aked allegations of control . . . will typ-

---

21. E*Trade's Amended Complaint also alleges that Nomura Canada controlled Breedon, RBF, D'Angelo, Smith, Evangelista, El–Batrawi, Khashoggi, Ultimate, and Native Nations. While the Eighth Circuit standard for establishing control person liability is indeed a liberal one, *see Martin v. Shearson Lehman Hutton, Inc.,* 986 F.2d 242, 244 (8th Cir. 1993), E*Trade has not provided the Court with *any* basis in its Amended Complaint to support allegations of control regarding these Defendants. *See Northwestern Nat'l Ins. Co. v. Baltes,* 15 F.3d 660, 662–63 (7th Cir.1994) (Easterbrook, J.) (noting that judges "are not archaeologists. They need not excavate masses of papers in search of revealing tidbits—not only because the rules of procedure place the burden on the litigants, but also because their time is scarce."). Thus, the Court will dismiss E*Trade's Section 20(a) claims against Nomura Canada alleging control over parties other than Reed.

ically suffice...." *Id.* at 352 (discussing Section 15). While the allegations of control presently before the Court might not pass muster under the more stringent standards of Fed.R.Civ.P. 9(b) or the Reform Act, the Court finds them sufficient to satisfy the notice pleading standards applicable to Section 20(a).

The Court will therefore grant Smith's motion and deny Nomura and Nomura Canada's motions under Section 20(a).[22]

## III. Common Law Fraud and Negligent Misrepresentation

The Trustee, FBW, and E*Trade have alleged common law fraud against all Defendants, save A.G. Edwards. In addition, FBW has asserted a claim for negligent misrepresentation against all Defendants in its action, with the exception again of A.G. Edwards. Breedon, Nomura, Nomura Canada, Reed and Smith have moved to dismiss on a variety of grounds.

### A. Common Law Fraud

■ To establish a cause of action for fraud under Minnesota Law, Plaintiffs must show (1) a false representation or omission of a material fact, (2) that the defendant knew the representation or omission was to be false, (3) that the defendant intended the plaintiff to act on the representation or omission, (4) the plaintiff was justified in relying on the representation or omission, and (5) the plaintiff suffered damages. *Bruzer v. Danek Medical, Inc.,* Civ. No. 3–95–971 (RHK/JJM), 1998 WL 1048225, at *6 (D.Minn.Oct. 1, 1998); *see also Davis v. Re–Trac Mfg. Corp.,* 276 Minn. 116, 149 N.W.2d 37, 38–39 (1967). These elements must be pleaded with par-

ticularity under Fed.R.Civ.P. 9(b). *In re Digi Int'l. Inc. Sec. Lit.,* 6 F.Supp.2d 1089, 1104 (D.Minn.1998).

Moving Defendants assert that Plaintiffs' common law fraud claims must be dismissed because (1) they did not make a direct representation to Plaintiffs, (2) they did not owe Plaintiffs a legal duty, and (3) Plaintiffs have failed to adequately allege reliance. None of these arguments is persuasive.

■ Under Minnesota law, Plaintiffs need not prove a direct misrepresentation to hold Defendants liable for common law fraud. "[T]he concealment of material and substantial facts ... amounts to a fraud on the plaintiff." *See Peterson v. Arellono,* 289 Minn. 541, 185 N.W.2d 282, 284 (1971); *see also Karlstad State Bank v. Fritsche,* 392 N.W.2d 615, 618 (Minn.Ct.App.1986). Indeed, it is well-settled that

> if a party conceals a fact material to the transaction, and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact were expressly denied, or the reverse of it expressly stated.

*Richfield Bank and Trust Co. v. Sjogren,* 309 Minn. 362, 244 N.W.2d 648, 650 (1976) (quoting *Thomas v. Murphy,* 87 Minn. 358, 91 N.W. 1097, 1098 (1902)).

■ Moreover, the possession of "special knowledge of material facts to which the other party does not have access" is, *by itself,* sufficient to generate a duty to disclose. *Klein v. First Edina Nat. Bank,* 293 Minn. 418, 196 N.W.2d 619, 622 (1972). Just as a defendant who

---

**22.** The parties agree that control-person liability under Minn.Stat. § 80A.23, subd. 3, follows the federal law. *See* Minn.Stat. § 80A.31 ("Sections 80A.01 to 80A.31 shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation of sections 80A.01 to 80A.31 with the related federal regulation."); (*see also* Tr. Oral Argument at 113 ("The state law ... follows the federal law on this control issue.").)

knowingly sells sheep "infected with a contagious distemper" has a duty to disclose that disease to the buyer, *Marsh v. Webber*, 13 Minn. 109 (1868), so too do participants in a scheme designed to inflate the price of securities and distribute the losses among unwitting broker-dealers have an obligation to alert those broker-dealers as to the underlying reality of the transactions. *See Richfield Bank*, 244 N.W.2d at 652 (holding that where bank had "[a]ctual knowledge of the fraudulent activities of one of its depositors, it had an affirmative duty to disclose those facts ... before it engaged in making [a] loan ... which furthered the fraud."). Thus, the Court finds that Defendants had an obligation not to conceal the scheme from Plaintiffs.

▅▅ Finally, Plaintiffs have properly alleged that Defendants intended to induce reliance and that their reliance was reasonable. *See Florenzano v. Olson*, 387 N.W.2d 168, 174 n. 4 (Minn.1986); *Davis*, 149 N.W.2d at 38–39. While Breedon asserts that the Trustee and FBW have failed to allege that they relied on anything he did or said, Minnesota law does not require that the defendant generate the plaintiff's reliance directly. *See Vikse v. Flaby*, 316 N.W.2d 276 (Minn.1982) (holding that defendants "cannot claim to be insulated from liability" where they "knew and intended [a third party] would be passing on this information to potential investors"). Plaintiffs have alleged, in detail, the manner in which they were defrauded and how they would have protected themselves had they had known of the true nature of the stock loan transactions. This is sufficient to allege that they "reli[ed] on the presumption that the [concealed] fact does not exist." *Flynn v. American Home Products, Corp.*, 627 N.W.2d 342, 350 (Minn.Ct.App.2001) (citing *Richfield Bank*, 244 N.W.2d at 650). Plaintiffs have therefore properly pleaded reliance.

Accordingly, the Court will deny Defendants' motions insofar as they relate to common law fraud.

**B. Negligent Misrepresentation**

▅▅ In addition to its claim for common law fraud, FBW has alleged one count of negligent misrepresentation. Minnesota has adopted the Restatement (Second) of Torts definition of this cause of action:

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care of competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552. A required element of this claim "is that the alleged misrepresenter owes a duty of care to the person to whom they are providing information." *Smith v. Woodwind Homes, Inc.*, 605 N.W.2d 418, 424 (Minn.Ct.App. 2000).

▅▅ Smith, Nomura, Nomura Securities, and Reed have moved to dismiss this count on a number of grounds. The Court, however, only need reach one: In negligent misrepresentation, as opposed to common law fraud, no duty of care exists between sophisticated equals negotiating an arm's length business transaction. *Id.; see also Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1019 (8th Cir.2001). While FBW's Amended Complaint attempts to reach behind the curtain to less sophisticated actors standing behind MJK, what is true, in this instance, for MJK is *a fortiori* true for Defendants. Where sophisticated equals negotiate, "the injured party's remedy is to sue either in contract or to sue for intentional misrepre-

sentation." *Safeco Ins. Co. v. Dain Bosworth,* 531 N.W.2d 867, 871 (Minn.Ct.App. 1995). The Court will therefore dismiss the negligent misrepresentation count in FBW's Amended Complaint.

## IV. Section 12(a)(1) of the 1933 Securities Act

The Trustee, FBW, and E*Trade have each brought claims against Section 12(a)(1) of the 1933 Securities Act ("Section 12(a)(1)"), 15 U.S.C. § 77*l* (a)(1). Only FBW's Section 12(a)(1) claims against Breedon and A.G. Edwards and E*Trade's claim against Nomura Canada are presently before the Court.

■ Under Section 12(a)(1), any person who

> offers or sells a security in violation of [section 5] ... shall be liable ... to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77*l* (a)(1). Section 5 prohibits the offer, sale, and delivery of any security unless a registration statement has been filed and is in effect for that security. 15 U.S.C. § 77e. Because Section 12 imposes strict liability and a plaintiff need not allege fraud or scienter, Section 12 claims are subject to the notice pleading requirements of Fed.R.Civ.P. 8. *In re Nations-*

*Mart Corp. Sec. Lit.,* 130 F.3d 309, 319 (8th Cir.1997).

A.G. Edwards, Breedon, and Nomura Canada assert the Court should dismiss the Section 12(a)(1) claims against them for a variety of reasons. First, Breedon and Nomura Canada argue that they cannot be held liable to FBW and E*Trade, respectively, under Section 12(a)(1) because they neither sold the relevant securities to those plaintiffs directly nor actively solicited the sales. Second, Nomura Canada argues that E*Trade's claim is untimely. Third, A.G. Edwards argues that stock loan transactions do not qualify as "sales" under the statute and that dismissal is appropriate on the basis of its affirmative defenses.[23] The Court will address each argument in turn.

### A. Sellers and Solicitors

Breedon and Nomura Canada contend that the Amended Complaints do not allege that they either sell securities or solicit sales. Under Section 12(a)(1), only a person who "offers or sells a security" can be liable to his purchaser. 15 U.S.C. § 77*l* (a)(1). In *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the Supreme Court construed this language and concluded that

> it imposes liability only on the buyer's *immediate* seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller.

*Id.* at 644 n. 21, 108 S.Ct. 2063 (emphasis added). The Supreme Court also concluded that liability extends to the person who

---

**23.** Nomura Canada also argues that E*Trade's claim must fail because E*Trade "never specifies [in its Amended Complaint] which shares fall into the unregistered category." (Nomura Canada's Mem. Supp. Mot. to Dismiss E*Trade's Am. Compl. at 14.) This argument, however, was without relevant legal support to begin with and Nomura Cana-

da did not mention it in its reply after E*Trade pointed to language in its Amended Complaint stating that "all of the stock lending transactions at issue here were in violation of section 5 of the 1933 Act." (*See* E*Trade Am. Compl. ¶ 129.) Accordingly, the Court will consider this argument–already on shaky legal footing–to be abandoned.

"solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. 2063. Thus, FBW or E*Trade can only recover under Section 12(a)(1) if (1) either Breedon or Nomura Canada were an "immediate seller," or (2) either "actively solicited the sale," *Steed Finance LDC v. Nomura Securities Int'l,* Civ. No. 00–8058(NRB), 2001 WL 1111508, at *7 (S.D.N.Y.Sep.20, 2001).

 Breedon and Nomura Canada are not immediate sellers under *Pinter.* While FBW does not attempt to argue the point as to Breedon, E*Trade asserts that Nomura Canada was "in reality E*Trade's seller" because it passed shares to E*Trade through MJK. (E*Trade Am. Compl. ¶ 227.) As discussed below, Section 2 of the 1933 Act defines "sale" to include "every contract of sale or *disposition of a security or interest in a security,* for value." 15 U.S.C. § 77b(a)(3) (emphasis added). Thus, E*Trade is correct that its primary transaction with MJK qualifies as a "sale." However, under Section 2's broad definition of "sale," each conduit or run-through transaction from Nomura Canada to MJK *also* qualifies as a sale. It is black letter law that "a buyer cannot recover against his seller's seller." *Pinter,* 486 U.S. at 644 n. 21, 108 S.Ct. 2063. Thus, because E*Trade has alleged that Nomura Canada stood, if anything, several sales removed from E*Trade's transaction with MJK, Nomura Canada does not qualify as an immediate seller.

██ Whether Breedon and Nomura Canada *solicited* the sale, however, poses a much closer question. Under *Pinter,* when a person "acting as an agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller." *Id.* at 646, 108 S.Ct. 2063. In general, "[t]he purchaser must demonstrate direct and active participation in the solicitation of the immediate sale." *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 635 (3d Cir.1989). Indeed, plaintiffs must usually show that a defendant "actually solicited their investment." *Capri v. Murphy,* 856 F.2d 473, 479 (2d Cir.1988).

There is, however, a narrow exception to this rule. Although the Supreme Court has rejected liability for those who merely "participate in soliciting the purchase," *Pinter,* 486 U.S. at 651 n. 27, 108 S.Ct. 2063 (internal quotations omitted), a court may find a defendant liable when he exerts such control over another's solicitation that those efforts are "directly attributable to" the defendant. *Capri,* 856 F.2d at 478 (upholding liability where solicitation was done "at the behest of" defendants and solicitor "took no action ... other than that which was contemplated and authorized by defendants").

> Here, FBW has alleged that Breedon told Brooks at MJK that when he received the 2 million shares of GENI from conduit broker-dealers ... he was not to return the stock to Native Nations but rather, loan it to FBW for further transfer to A.G. Edwards and ultimately for receipt back by Deutsche Bank Canada. Brooks repeated these instructions to FBW.

(FBW Am. Compl. ¶ 223.) Likewise, E*Trade has alleged that Brooks was acting "on behalf of Nomura, Nomura Canada, and the other defendants." (E*Trade Am. Compl. ¶ 102.) While Plaintiffs will need evidence to survive summary judgment on this point, the facts alleged do not make it "beyond doubt that the plaintiff cannot prove any set of facts in support of his claim" to demonstrate that level of control. *Schaller Tel. Co.,* 298 F.3d at 740 (internal citations omitted). Given the notice pleading standards applicable to Section 12(a)(1), and the present procedural

posture, the Court concludes that FBW and E*Trade have alleged facts supporting the inference that Breedon and Nomura controlled Brooks to such an extent that his solicitations were "directly attributable to" them. *Capri*, 856 F.2d at 478. Accordingly, they qualify as solicitors for the purpose of these motions.

## B. Statute of Limitations

Nomura also asserts that E*Trade's Section 12(a)(1) claim is time-barred. A claim under Section 12 must be brought "within one year after the violation" and no more than "three years after the security was bona fide offered to the public." 15 U.S.C. § 77m.

### 1. One–Year Limitations Period

■■■■ E*Trade's Section 12(a) claim meets the one year limitations period. The Court measures the one-year limitations period by focusing on the last conduct constituting the alleged violation. *See Meadows v. Pacific Inland Securities Corp.*, 36 F.Supp.2d 1240, 1243 (S.D.Cal. 1999). As stated in *Doran v. Petroleum Management Corp.*, 576 F.2d 91, 93 (5th Cir.1978), "the relevant inquiry [is on] which of the defendants' activities–offer, sale, or delivery–occurred last as that [is] the time from which to measure the limitation period." *See also* 54 C.J.S. Limitations of Actions § 202. E*Trade alleges–and Nomura Canada concedes–that the shares at issue were "delivered" on September 26 and 28, 2001. (See E*Trade Am. Compl. ¶ 226(c); Nomura Canada's Mem. Supp. Mot. to Dismiss E*Trade's Am. Compl. at 14–15.) Because E*Trade filed its Complaint on September 25, 2002,

this claim falls within the one-year period.[24]

### 2. Three–Year Limitations Period

■■■■ E*Trade's Section 12(a) claim is also not barred by the three-year limitations period, although for different reasons. Under 15 U.S.C. § 77m, claims must also be brought within three years of the date that they were "bona fide offered to the public." This three-year period constitutes "an absolute limitation which applies whether or not the investor could have discovered the violation." *Jackson Nat'l Life Ins. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir.1994).

■■■■ While Nomura Canada cites authority for the proposition that the three-year period is valid for unregistered securities, *see Speigel v. Quality Bakers of America Cooperative, Inc.*, 91 Civ. No. 5703(KTD), 1992 WL 349799, at *5 (S.D.N.Y. Nov. 10, 1992), the Court finds that the better view is that such shares are never, in fact, "bona fide offered to the public," 15 U.S.C. § 77m. Because the offer of "unregistered securities is unlawful, it follows that … the 'bona fide offered to the public' provision does not apply." *See Bradford v. Moench*, 809 F.Supp. 1473, 1487 (D.Utah 1992). As the Southern District of Florida stated almost thirty-years ago, "[t]o hold as the defendants suggest would be to give individuals a license to sell unregistered securities to whomsoever they wished if they first offered the security to a group of people and, so to speak, 'ran the gauntlet' for three years." *In re Bestline Prods. Secs. & Antitrust Litig.*, No. MDL 162–CIV–

---

**24.** In its reply brief, Nomura Canada seeks to direct the Court's attention to matters outside the pleadings to argue that E*Trade was, in fact, obliged to accept the shares, and may therefore not rely on the September 26 and 28, 2001 transactions to extend the limita-

tions period. The Court, however, will not consider matters outside the pleadings for purposes of these motions, or legal theories based upon them. *See Hamm v. Rhone–Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 948 (8th Cir.1999).

JLK, 1975 WL 386, at *3 (S.D.Fla. Mar.21, 1975). Such a result would be clearly inconsistent with the "registration requirements at the heart of the Act." *Pinter*, 486 U.S. at 638, 108 S.Ct. 2063. Accordingly, the Court concludes that the three-year limitations period does not apply to unregistered securities. E*Trade's Section 12(a)(1) claim is therefore timely.

### C. Sales and Defenses

■ A.G. Edwards offers several arguments in favor of its motion to dismiss the sole claim against it, none of which needs occupy much space here. To begin with, A.G. Edwards asserts that the stock loan transactions are not "sales" and thus need not comply with the registration requirements of Section 5. As stated above, however, the definition of "sale" under Section 2 of the 1933 Act is quite broad and includes "every contract of sale or *disposition of a security or interest in a security, for value.*" 15 U.S.C. § 77b(a)(3) (emphasis added). As the Supreme Court stated in an analogous context:

> Obtaining a loan secured by a pledge of shares of stock unmistakably involves a "disposition of [an] interest in a security, for value." Although pledges transfer less than absolute title, the interest transferred is nonetheless an "interest in a security." The pledges contemplated a self-executing procedure under a power that could, at the option of the pledgee (the bank) in the event of a default, vest absolute title and ownership.

*Rubin v. United States*, 449 U.S. 424, 431, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *see also* Ira L. Sorkin and Carmen J. Lawrence, *An Overview of Stock Loans/ Stock Borrowing*, 501 PLI/Corp 275, 298 (1985) ("Applying the Supreme Court's rationale in *Rubin* to the loan of a security, one must conclude that the loan constitutes a 'sale' for purposes of the antifraud provisions [of the 1933 and 1934 Acts].") Because the stock loans at issue here involve an "interest in a security" and are exchanged "for value," they are "sales" as defined by Section 2.

■ In addition, A.G. Edwards asserts two defenses, neither of which are particularly apt in the context of a motion to dismiss. First, A.G. Edwards argues that the stock loan transaction at issue was exempt from registration under Section 4(1) of the 1933 Act because it was not acting as an issuer, underwriter or dealer. That exemption, however, is an affirmative defense that must be *proved* by the party asserting the exemption, *see SEC v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *Ackerberg v. Johnson*, 892 F.2d 1328, 1335 (8th Cir. 1989), and is therefore generally "not a basis for a motion to dismiss under 12(b)(6) but rather a matter to be pleaded as an affirmative defense," *Stern v. American Bankshares Corp.*, 429 F.Supp. 818, 827 (E.D.Wis.1977); *see also Baldwin v. Kulch Associates, Inc.*, 39 F.Supp.2d 111, 115 (D.N.H.1998) ("Defendants may avoid the broad registration requirements of section 5 by proving the affirmative defense that the securities were exempt under 15 U.S.C. § 77d."). While dismissal might be appropriate where the complaint *clearly* shows the existence a defense, *see* Wright and Miller, *Federal Practice and Procedure* § 1357, FBW is entitled to the benefit of all reasonable factual inferences and A.G. Edwards has not demonstrated that its affirmative defense presents an insuperable bar to relief.

■ Second, A.G. Edwards contends that FBW's claim against it should be dismissed based on the *in pari delicto* defense. "The equitable defense of *in pari delicto*, which literally means 'in equal fault,' is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Pinter*, 486

U.S. at 632, 108 S.Ct. 2063. In order to bar recovery, the plaintiff's conduct must be "at least *equally* responsible for the actions that render the sale of the unregistered securities illegal." *Id.* at 636, 108 S.Ct. 2063 (emphasis added). Because *in pari delicto* requires "the trial court to make a determination of fact regarding the mutual fault of the parties," a resolution of the defense "on a motion to dismiss would be inappropriate." *Haynes v. Anderson & Strudwick, Inc.,* 508 F.Supp. 1303, 1317 (E.D.Va.1981). This is especially true where, as here, the circumstances surrounding the September 28, 2001 return of the securities–where both parties knew that FBW would be unable to sell the securities–arguably put the parties in different positions than in the original September 21, 2001 loan transaction.[25] Accordingly, the Court finds that there is "no basis for concluding *at this stage* of this litigation that the [plaintiffs] were *in pari delicto* . . . ." *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 314, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (emphasis added).

### D. Conclusion

Accordingly, the Court finds that Plaintiffs have stated cognizable claims. It will therefore deny Breedon, A.G. Edwards, and Nomura Canada's motions as they pertain to Section 12(a)(1).

### V. Section 11 of the 1933 Securities Act

 Nomura Canada has moved to dismiss E*Trade's Section 11 claim. Section 11 "allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381, 103 S.Ct.

683, 74 L.Ed.2d 548 (1983). Plaintiffs alleging Section 11 violations are only required to "comply with the short and plain statement requirements of Rule 8(a)." *Romine v. Acxiom Corp.,* 296 F.3d 701, 705 (8th Cir.2002).

 Nomura Canada argues that E*Trade has not alleged that it is an "underwriter" –one of the "enumerated parties" eligible for liability under this section. To establish a prima facie case under Section 11, however, "a plaintiff need show *only* that he bought the security and that there was a material misstatement or omission." *In re NationsMart Corp. Sec. Litig.,* 130 F.3d at 315 (emphasis added). As stated above, exemption from the registration requirements is an affirmative defense that must be proved by the party asserting the exemption. *See Ackerberg,* 892 F.2d at 1335. Here, not only has E*Trade alleged that it bought GENI shares and that the registration statement contained a material misstatement or omission (*see* E*Trade Am. Compl. ¶ 257, 260), it has also plainly alleged that Nomura Canada is an underwriter (*see id.* at ¶ 222). Because that is *more* than sufficient to state a claim under the notice pleading requirements applicable to this section, *see NationsMart,* 130 F.3d at 315–16; *In re College Bound Consol. Litigation,* 93 Civ. No. 2348(MBM), 1994 WL 172408, at *3 (S.D.N.Y May 4, 1994), the Court will deny Nomura Canada's motion with regard to Section 11.

### VI. Section 9 of the Exchange Act of 1934

The Trustee and E*Trade allege that Defendants violated Section 9 of the Exchange Act of 1934, 15 U.S.C. § 78i. Under 9(a)(2) it is illegal

---

**25.** The facts surrounding these transactions, at the very least, require greater factual development.

[t]o effect, alone or with one or more other persons, a series of transactions ... creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(2). Section 9(e) imposes liability on anyone who "willfully participates" in such a violation. 15 U.S.C. § 78i(e).

Defendants Nomura Canada, Reed, and Smith challenge E*Trade's Section 9 claim on one procedural and three substantive grounds. The procedural argument, advanced by Smith alone, is that E*Trade's Section 9 claim is time-barred under a one-year statute of limitations. The substantive arguments are advanced by all three Defendants and roughly follow their Rule 10b-5 challenges. The Court will begin with the statute of limitations.

### A. Statute of Limitations

■ Smith contends that E*Trade's Section 9 claim is barred by the one-year limitations period of 15 U.S.C. § 78i(e). While there is some debate about whether the new, longer limitations period of the Sarbanes–Oxley Act overrides Section 9's express one-year limitations period, *compare* John C. Coffee, Jr., *Brief Tour of the Major Reforms of the Sarbanes–Oxley Act,* SH097 ALI–ABA 151, 174 (2002), *with* Michael A. Perino, *Enron's Legislative Aftermath,* 76 St. John's L.Rev. 671, 693 (2002), the Court concludes that the better view is that the express one-year limitations period remains in effect. *See* 28 U.S.C. § 1658 (stating that longer limitations period applies "[e]xcept as otherwise provided by law."). Even under this shorter limitations period, however, Smith has not demonstrated that E*Trade's claim is untimely.

■ Under 15 U.S.C. § 78i(e), "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." As the Eighth Circuit noted in an analogous context, the standard is "an objective one" under which the plaintiff must "exercis[e] reasonable diligence" to uncover the fraud. *Ritchey v. Horner,* 244 F.3d 635, 639 (8th Cir.2001). Failure to file suit within the limitations period is an affirmative defense for which the party asserting the defense bears the burden. *Id.* (citing *Law v. Medco Research, Inc.,* 113 F.3d 781, 786 (7th Cir.1997); *Schmidt v. United States,* 933 F.2d 639, 640 (8th Cir.1991)).

■ Smith has not carried that burden. As the Second Circuit has stated, "Because we are, on a motion to dismiss, limited to the facts contained in, or incorporated into, the complaint, we cannot rule as a matter of law that the [plaintiffs] had constructive notice of the [fraud]." *Rothman v. Gregor,* 220 F.3d 81, 98 (2d Cir. 2000). While Smith argues that the September 2001 collapse of MJK and the GENI share price should have put E*Trade on inquiry notice as to the potential for fraud, there is nothing in the Amended Complaint to indicate that Smith's role, in particular, should have been clear to E*Trade at that time. Because Smith has not demonstrated that "a reasonably diligent investor would have brought suit before this suit was actually filed," *Law,* 113 F.3d at 787, and because it is not "beyond doubt that the plaintiff could ... prove any set of facts" to show that it filed suit within the limitations period, *Schaller Tel. Co.,* 298 F.3d at 740, the Court concludes Smith has not demonstrated that E*Trade's Section 9 claim is untimely.

### B. Substantive Challenges

Nomura Canada, Reed, and Smith challenge the Section 9 claim on the additional

grounds that (1) E*Trade has not alleged that Reed or Smith engaged in the phony day trading that forms the basis of the Section 9 claim, (2) the Section 9 allegations do not generate the strong inference of scienter required under the Reform Act, and (3) E*Trade has not alleged loss causation because September 11th, rather than Defendants' scheme, caused the injury. Each of these arguments is without merit.

■ E*Trade's Section 9 allegations are not limited to phony day trading. The Section 9 claim incorporates *all* of the Amended Complaint's factual allegations. (*See* E*Trade Am. Compl. ¶ 281.) Accordingly, Defendants cannot claim, as they repeatedly do, that the factual predicate for this count is somehow limited to day trading. E*Trade has alleged a series of securities loan transactions that both funded the fraudulent trading and artificially restricted the supply, and thereby the price, of the relevant securities. Because Section 9 does not merely proscribe phony day trading, but also "every ... device used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage," S.Rep. No. 73–1455, 73d Cong., 2d Sess. 54 (1934), E*Trade's allegations against these Defendants fall well within the scope of the rule.

■ E*Trade has also properly alleged scienter. As with the Rule 10b–5 claim, the Amended Complaint alleges the sort of deliberate, orchestrated, illegal manipulation of the stock market that can only happen intentionally. *See In re IPO*, 241 F.Supp.2d at 385. Where the market has been intentionally manipulated to ensure a rise in price for a specific security, the transactions are expressly carried out "for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). As alleged, the scheme establishes a "strong inference" of scienter required under the Reform Act.

Finally, Reed, Nomura Canada, and Smith once again advance the grim argument that September 11th, rather than the conduct alleged in the Amended Complaint, caused E*Trade's losses. This fares no better, however, under Section 9 than it did under Rule 10b–5. Without the illegal activity alleged in the Complaint, E*Trade would not have participated in the securities lending transactions at all. *See Harris,* 787 F.2d at 366. Therefore, the alleged fraud, not the terrorist attacks, proximately caused E*Trade's losses. Accordingly, E*Trade has stated a claim as to Section 9.[26]

## VII. Minnesota Prevention of Consumer Fraud Act

■ Breedon, Reed, Nomura Canada, and Smith have moved to dismiss the Trustee and E*Trade's claims under the Minnesota Prevention of Consumer Fraud Act ("MPCFA"), Minn.Stat. § 325F.68–70. The MPCFA prohibits:

The act, use, or employment by any person of any fraud, false pretense, false

---

26. Minn.Stat. § 80A.03 is the Minnesota counterpart to Section 9. *See In re Flight Transp. Corp. Sec. Litig.,* 593 F.Supp. 612 (D.Minn.1984) (Weiner, J., sitting by designation). Thus, the Court's substantive analysis with regard to Rule 9 applies equally to the claims under Minn.Stat. § 80A.03. *See* Minn. Stat. § 80A.31 ("Sections 80A.01 to 80A.31 shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation of sections 80A.01 to 80A.31 with the related federal regulation."). As stated above, because the relevant transactions involving *all* Plaintiffs were funneled through MJK in Minnesota, it is appropriate for Plaintiffs to invoke the protections of the Minnesota Securities Act. *See* Minn.Stat. § 80A.03 (statute applies when any act instrumental in effecting prohibiting conduct is done in Minnesota).

promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby. . . .

Minn.Stat. § 325F.69, subd. 1. In determining the applicability of the MPCFA, the Minnesota Supreme Court has distinguished between an ordinary consumer and a merchant, as defined in the Uniform Commercial Code. *Church of the Nativity of Our Lord v. WatPro, Inc.,* 491 N.W.2d 1, 7 (Minn.1992) *overruled on other grounds, Ly v. Nystrom,* 615 N.W.2d 302, 314 n. 25 (Minn.2000). The MPCFA is designed "to protect a broad, though not limitless, range of individuals from fraudulent and deceptive trade practices." *Ly,* 615 N.W.2d at 310.

Breedon, Reed, Nomura Canada, and Smith have moved to dismiss the MPCFA claims on the ground that the Amended Complaints only allege that sophisticated merchants, rather than consumers, were defrauded under the Act. The Trustee and E*Trade assert that dismissal of this claim is inappropriate because they are not "merchants" under the UCC definition and, even if they are, the MPCFA no longer excludes merchants from its protection. Plaintiffs are incorrect.

■ The UCC defines "merchant" as: A person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

Minn.Stat. § 336.2–104(1). This contemplates three categories of merchants: (1) those who deal in goods; (2) those who hold themselves out as possessing knowledge or skill relevant to the transaction; and (3) those to whom such knowledge or skill can be imputed by their use of a professional intermediary. While the Trustee and E*Trade are correct that the definition of goods excludes "investment securities," Minn.Stat. § 336.2–105(1), the above definition is expressed in the *disjunctive* and does not require Plaintiffs to satisfy each of the three categories above. The allegations in the Amended Complaints make it perfectly clear that Plaintiffs, "by [their] occupation hold[ ] [themselves] out as having knowledge or skill peculiar to" the stock lending transactions at issue in this lawsuit. *See* Comment, Minn.Stat. § 336.2–104 ("[A]lmost every person in business would . . . be deemed to be a 'merchant' under [this] language. . . ."). Accordingly, Plaintiffs are merchants under Minnesota law.

In the alternative, the Trustee and E*Trade argue that the merchant exclusion no longer applies after the Minnesota Supreme Court's holding in *Group Health Plan, Inc. v. Philip Morris, Inc.,* 621 N.W.2d 2 (Minn.2001). In interpreting the language of Minn.Stat. § 8.31, subd. 3a, which provides a private right of action for "any person" damaged by a violation of the consumer fraud statutes, among others, the supreme court stated that "we are not inclined to adopt a limited meaning for the unambiguous phrase 'any person'. . . ." *Group Health,* 621 N.W.2d at 9. However, as this Court has previously held, *Group Health* was directed at whether non-purchasers have *standing* under Minn.Stat. § 8.31, subd. 3a, not the scope of the substantive provisions of Minn.Stat. § 325F.68–70, the consumer fraud statute. *See Marvin Lumber v. PPG Indus.,* Civ. No. 495–739 (DWF/RLE), 2001 WL 228427, at *7 (D.Minn.Feb. 27, 2001) (Frank, J.) (emphasis added). Thus, the Eighth Circuit has continued to apply the

merchant exclusion as "preclud[ing] a cause of action under the Consumer Fraud Act by a commercial trader...." *Gas Aggregation Servs. v. Howard Avista*, 319 F.3d 1060, 1069 (8th Cir.2003). Because this case does not involve non-purchaser merchants suing to vindicate widespread harm to consumers, but rather "transactions between sophisticated ... traders," *id.*, *Group Health* does not apply. The Court will therefore dismiss the Trustee and E*Trade's claims under the MPCFA.

## VIII. Civil Conspiracy

■ Reed, Nomura, Nomura Canada, and Smith have moved to dismiss FBW and E*Trade's civil conspiracy claims. Conspiracy, under Minnesota law, is based on the commission of an underlying tort:

> [S]ince in so-called civil conspiracy cases liability is predicated upon the tort committed by the conspirators and not to the conspiracy, allegations of conspiracy do not change the nature of the cause of action.

*Harding v. Ohio Casualty Ins. Co.*, 230 Minn. 327, 41 N.W.2d 818, 825 (1950); *see also Gaming Corp. v. Dorsey & Whitney*, 88 F.3d 536, 551 (8th Cir.1996). "The gist of the action is not the conspiracy charged, but the tort working the damage to the plaintiff." *Harding*, 41 N.W.2d at 824.

■ Moving Defendants argue that dismissal of the civil conspiracy claims against them is appropriate on two grounds. First, they assert that FBW and E*Trade have failed to tie their conspiracy charges to a substantive tort. FBW has alleged, however, that "Fraud Defendants [which excludes A.G. Edwards] engaged in a course of conduct that acted as a fraud upon FBW and others in violation of Minnesota common law." (FBW Am. Compl. ¶ 320(f).) Likewise, E*Trade has entitled its conspiracy count "CONSPIRACY TO DEFRAUD." (E*Trade Am. Compl. at 104.) These allegations are suf-ficient to notify Defendants as to the claims against them.

■ Second, moving Defendants argue that FBW and E*Trade have failed to plead the elements of conspiracy with adequate specificity. As discussed above, however, the Court has already found that Plaintiffs have stated a claim for common law fraud. Consequently, their *conspiracy* allegations need not be pleaded with particularity under Fed.R.Civ.P. 9(b). As the Seventh Circuit has held:

> Rule 9(b) has a short list of matters (such as fraud) that must be pleaded with particularity; conspiracy is not among them. '[I]t is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with.'

*Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir.2003) (Easterbrook, J.) (quoting *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir.2002)). Likewise, the Eighth Circuit notes:

> [C]onspiracies are by their nature usually clandestine. It is unlikely that a plaintiff in a conspiracy case will be able to provide direct evidence of a conspiratorial agreement. Thus, such evidence is not necessary to prove that a civil conspiracy existed. Accordingly, depending upon the conspiracy alleged in any particular case, the complainant may or may not be in a position to allege with precision the specific facts giving rise to the claim.

*White v. Walsh*, 649 F.2d 560, 561 (8th Cir.1981) (internal quotation and citation omitted). Plaintiffs have pleaded facts indicating that "defendants had directed themselves toward an [illegal] action by virtue of a mutual understanding, and some factual allegations suggesting such a 'meeting of the minds.'" *Id.* (internal quotation omitted). As such, they have plead-

ed the elements of a conspiracy with adequate specificity under the Federal Rules. Accordingly, the Court will deny the motions to dismiss as they relate to FBW and E*Trade's civil conspiracy claims.

## IX. RICO and the Reform Act

Plaintiffs have pleaded claims–sometimes in the alternative, sometimes not–under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* Deutsche Bank, Breedon, Nomura, Nomura Canada, and Smith argue that the Reform Act bars Plaintiffs' RICO claims. They are correct.

In 1995, as part of the Reform Act, Congress amended RICO by narrowing the kind of conduct that could qualify as a predicate act under the statute. Section 107 of the Reform Act amended 18 U.S.C. § 1964(c) to provide as follows:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. § 1964(c) (emphasis added). According to the Conference Committee Report accompanying § 107, the Reform Act amendment to the RICO statute was intended not only "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." H.R. Conf. Rep. No. 104–369, at 47 (1995), U.S. Code Cong. & Admin. News 1995, pp. 730, 746 (as quoted in *Bald Eagle Area*

*School Dist. v. Keystone Financial,* 189 F.3d 321, 327 (3d Cir.1999)).

Plaintiffs argue, without relevant case support, that the alternative pleading provisions of Fed.R.Civ.P. 8(e)(2) should permit them to proceed with their RICO cases through summary judgment. As the Trustee's counsel stated at oral argument:

[W]hat [Defendants are] really saying is [w]e get all the bites of the apple that we want. We want to start by dismissing your [RICO] claims and, then, we're going to be free to challenge your securities claims. We're free to leave you in a situation where you have no federal law remedy, where there's two to 300 million dollars of loss, many, many people lost their jobs, countless people have had their lives destroyed by this, this has resulted in the largest bailout in SIPC's history. But they would like you to dismiss these claims now and, then, seriatim, they will come at our securities-law claims and that, we believe, is absolutely improper.

(Tr. Oral Argument at 205–06.) While counsel articulately spells out the potential consequences for Plaintiffs, this argument nonetheless fails.

Without support in the case law or legislative history, Plaintiffs rely, as they must, on the alternative pleading provisions of Fed.R.Civ.P. 8(e)(2). Rule 8(e)(2), however, like the rest of the Federal Rules, does not "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). While the securities laws are more limited than RICO, they nonetheless "generally provide adequate remedies for those injured by securities fraud." *Baker v. Pfeifer,* 940 F.Supp. 1168, 1174 (S.D.Ohio 1996) (quoting the congressional testimony of SEC Chairman Arthur Levitt).

Defendants have launched a broad attack on Plaintiffs' securities law claims. None of these arguments, however, has

persuaded the Court that the allegations in the Amended Complaints are not actionable as securities fraud. Discovery, of course, may not bear out Plaintiffs' allegations. That risk, however, is no different than the risk faced by every plaintiff in every proceeding. Given the clear legislative intent to prevent plaintiffs from "plead[ing] ... offenses ... based on conduct that would have been actionable as securities fraud," *Bald Eagle Area*, 189 F.3d at 327 (quoting H.R. Conf. Rep. No. 104–369 at 47, U.S. Code Cong. & Admin. News 1995, p. 746), and to "completely eliminat[e] the so-called 'treble damage blunderbuss of RICO' in securities fraud causes," *Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 164 (3rd Cir.1998) (quoting 141 Cong. Rec. H2771) (internal citation omitted), the Court finds that the Reform Act bars plaintiffs from pleading RICO counts in the alternative. *See Hemispherx Biopharma, Inc. v. Asensio*, Civ. No. 4–98–5204, 1999 WL 144109, at *4 (E.D.Pa. Mar.15, 1999); *Ostler v. Codman Research Group, Inc.*, Civ. No. 98–356–JD, 1999 WL 1059684, at *6 (D.N.H. Apr.20, 1999). Accordingly, the Court will grant Defendants' motions to dismiss the RICO claims against them.[27]

### X. Personal Jurisdiction

 In addition to challenging the causes of action discussed above, Smith and Reed have moved to dismiss on the ground that the Court cannot exercise personal jurisdiction over them. "To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant." *Digi–Tel Holdings*, 89 F.3d at 522. To establish a prima facie showing, "the court must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor." *Id.* (citing *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir.1991)).

Smith and Reed challenge the Court's exercise of personal jurisdiction on different grounds. Smith argues that, should the Court dismiss the federal claims against him, dismissal of the state claims for lack of personal jurisdiction follows as a matter of course. As discussed above, however, the Court has found that FBW and E*Trade have alleged viable federal securities claims against Smith. The Court therefore, as Smith concedes, has personal jurisdiction over him under the nationwide service provisions of the 1934 Act. *See* 15 U.S.C. § 78aa. Reed presents a slightly different problem, however. As a Canadian resident and citizen, he asserts that he lacks sufficient minimum contacts with the relevant forum–in this case, the United States–to be subject to personal jurisdiction in this Court.

Under the nationwide service provision of Section 27 of the 1934 Act, 15 U.S.C. § 78aa, Congress extended personal jurisdiction to the full extent permitted by the Due Process Clause of the Fifth Amendment:

While Congress was doubtless thinking mainly in terms of exercising its power "to provide that the process of every

---

**27.** The Trustee asserts that Count XII of its Amended Complaint, which alleges that Deutsche Bank violated RICO by illegally propping-up Native Nations, is premised on conduct that did not occur in connection with the purchase or sale of securities. The challenged activity, however, is not distinct from the larger scheme, which the Court has already ruled is actionable as securities fraud.

The Trustee "cannot magically revive his claim by picking out discrete details of his allegations and then claiming they are not actionable as securities fraud." *Burton v. Ken–Crest Servs., Inc.*, 127 F.Supp.2d 673, 677 (E.D.Pa.2001). Because Count XII displays such a "surgical presentation," *Bald Eagle Area*, 189 F.3d at 330, the Court will dismiss it along with the other RICO claims.

District Court shall run into every part of the United States," ... [Congress's use of language] demonstrates an intention to authorize service on a defendant who can be "found" only in a foreign country, and although the section does not deal specifically with *in personam* jurisdiction, it is reasonable to infer that Congress meant to assert personal jurisdiction over foreigners not present in the United States [ ] but, of course, not beyond the bounds permitted by the due process clause of the Fifth Amendment.

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir.1972) (as quoted in *Travis v. Anthes Imperial Ltd.*, 473 F.2d 515, 529 (8th Cir.1973)). While "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field," *United States v. First Nat'l City Bank*, 379 U.S. 378, 404, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965) (Harlan, J. dissenting), personal jurisdiction can nonetheless be acquired consistent with due process "over [foreign] defendants who have acted within the [relevant forum] or sufficiently *caused foreseeable consequences there*, by service of process on them in [the foreign country]." *Travis*, 473 F.2d at 529 (emphasis added).

▉ Granting FBW and E*Trade the appropriate factual inferences, the Court finds that they have demonstrated that Reed's activity had foreseeable effects in the United States. "[W]here a defendant has acted in such a way as to have 'caused consequences' in the [relevant] forum," *Securities and Exchange Comm'n v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990), "he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Here, FBW and E*Trade's declarations and their accompanying exhibits generate the inference that Reed intentionally participated in the fraudulent se-

curities transactions at issue in this litigation. (Fleming Decl. Ex. 1–162; St. John Decl. Ex. 1–162.) These materials also give rise to the inference that it was foreseeable to Reed that the solvent American broker-dealers would bear the burden of that fraudulent activity. (*See id.*) As he stated of these American intermediaries upon the scheme's collapse: "Now they're the one that's going to get f—cked, right?" (Fleming Decl. Ex. 157; St. John Ex. 157.)

Moreover, at least two conduct-related factors support a finding of personal jurisdiction. First, the evidence indicates that Reed's activity was "purposely directed" toward the United States securities market. *See Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 103, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 192 B.R. 73, 79–80 (S.D.N.Y. 1996) (holding that the passing of funds, on defendant's instructions, through a U.S. account is sufficient to constitute "doing an act in the United States" for purposes of personal jurisdiction).

Second, the evidence shows that Reed engaged in numerous phone calls with persons in the United States in furtherance of the scheme. While phone calls "do not themselves establish jurisdiction," they "may be used to support the exercise of personal jurisdiction." *Digi–Tel Holdings*, 89 F.3d at 523. Here, FBW and E*Trade have submitted the testimony from a related proceeding of Thomas Brooks, the head of securities lending at MJK, stating that Reed, along with D'Angelo and Breedon, "kind of quarterback[ed] the events" relating to the exchange of GENI shares for ICII bonds through a conference call placed to MJK in Minnesota. (*See* Fleming Decl. Ex. 227; St. John Decl. Ex. 227.) Moreover, Reed himself avers:

> During the six-month period that Nomura Canada borrowed GENI stock, I had

approximately twenty phone conversations with [Nomura in the United States] concerning the stock, with the calls increasing in frequency after the price of GENI dropped in September 2001.

(Reed Decl. ¶ 5.)

The totality of this evidence–from the phone calls, to the activity performed "for the very purpose of having [its] consequences felt in the [relevant] forum," *Dakota Indus.*, 946 F.2d at 1391 (quoting *Brainerd v. Governors of Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir.1989)), to the foreseeable effects on U.S. broker–dealers–compels a finding that FBW and E*Trade have established at least a prima facie case of personal jurisdiction. The Court will therefore deny the motions to dismiss the Amended Complaints for lack of personal jurisdiction.[28]

### XI. Federal Rule of Civil Procedure 8(a)(2)

Finally, Breedon has brought a motion to dismiss the Amended Complaints on the ground that they fail to comply with Rule 8(a)(2) of the Federal Rules of Civil Procedure. Rule 8(a)(2) provides that "[a] pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...." Rule 8(e)(1) states, in part, that "[e]ach averment of a pleading shall be simple, concise, and direct." Read together, "Rules 8(a) and 8(e)(1) underscore the emphasis placed on clarity and brevity by the federal practice rules." Wright and Miller, 5 *Federal Practice and Procedure* § 1217 (1990).

The Court acknowledges a bit of temptation here. Nevertheless, viewing the almost 400 pages and 1,000 paragraphs of the Amended Complaints, the Court finds that they comply with the Federal Rules. Rule 9(b) states, in pertinent part: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Eighth Circuit has explained that, for the purposes of Rule 9(b), "circumstances" include

> such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.... [C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule.

*Commercial Property Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th

---

**28.** FBW and E*Trade have appropriately submitted a great deal of factual material in connection with Reed's motion to dismiss for lack of personal jurisdiction, which Nomura, Nomura Canada, and Reed have used in their reply briefs regarding their 12(b)(6) motions. As a result, FBW and E*Trade have moved the Court to strike the use of such materials as matters outside the pleadings.

The decision of whether or not to consider matters outside the pleadings is entrusted to the Court's discretion. *See, e.g., Kehs v. Foster*, 16 F.3d 1227, 1994 WL 20650 (8th Cir. 1994) (per curiam) (table), *cert. denied*, 511 U.S. 1107, 114 S.Ct. 2101, 128 L.Ed.2d 663 (1994). The Eighth Circuit has interpreted the phrase "matters outside the pleadings" to include "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir.1992) (internal citation omitted).

The materials used by the Nomura-related Defendants do not merely reiterate what is said in the pleadings; in fact, they are expressly used to *contradict* the pleadings. Moreover, the thousands of pages of separately transcribed telephone conversations cannot fairly be said to be a document relied upon in the pleadings. Because consideration of these documents would most likely convert the present motions to motions for summary judgment–which the Court is not inclined to do–FBW and E*Trade's motions to strike will be granted.

Cir.1995) (quotations and citations omitted); *see also DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) ("[T]he circumstances [constituting fraud] must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story.").

 The Amended Complaints, as Breedon appropriately notes, are neither particularly short nor particularly plain. Rule 8(a), however, "must be read in harmony" with Rule 9(b). *Abels v. Farmers Commodities Corp.,* 259 F.3d 910, 920 (8th Cir.2001) (internal quotation omitted); *see also Lister v. Oakley, Inc.,* Civ. No. SAC V97–809 (GLT/EEX), 1999 WL 816928, at *2 (C.D.Cal.Jan. 14, 1999). Given the complicated scheme alleged in the Amended Complaints – involving, as it does, numerous defendants and multiple transactions– it is appropriate that Plaintiffs present their allegations *in detail* to comply with Rule 9(b) and the heightened pleading standards of the Reform Act.

Rather than the sort of "disjointed, confusing, and at times unintelligible" complaints that courts routinely dismiss, *Jennings v. Emry,* 910 F.2d 1434, 1435 (7th Cir.1990), the Amended Complaints are well-written, well-organized, and–if the motions to dismiss are any indication–have effectively alerted Defendants of the claims against them. As such, they are consistent with the Federal Rules. The Court will therefore deny Breedon's motion under Rule 8(a).[29]

### Conclusion

In the matter of *James P. Stephenson v. Deutsche Bank AG, et al.,* Civ. No. 02–4845 (RHK/AJB), based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED:**

1. The Motion by Deutsche Bank Defendants to Dismiss Counts IV, XI, XII & XIII of the Amended Complaint (Doc. No. 28) is **GRANTED.** Counts IV, XI, XII & XIII of the Amended Complaint (Doc. No. 1) are **DISMISSED WITH PREJUDICE** against these Defendants;

2. The Motion by Defendant Wayne Breedon to Dismiss Plaintiff's Amended Complaint Pursuant to Fed.R.Civ.P. 8 and 12(f) (Doc. No. 35) is **DENIED;**

3. The Motion by Defendant Wayne Breedon to Dismiss Counts I, IV, VIII, IX, XI, XII, XIII, XIV and XV of the Amended Complaint [Doc. No. 39] is **GRANTED IN PART.** Counts IV, XI, XII, XIII, and XV of the Amended Complaint (Doc. No. 1) are **DISMISSED WITH PREJUDICE** against this Defendant;

4. The Motion by Defendant Richard Evangelista for Leave to File Motion Out of Time and for Order to Join Co–Defendants' Motions (Doc. No. 61) is **DENIED;**

In the matter of *Ferris, Baker Watts, Inc. v. Deutsche Bank Securities Limited, et al.,* Civ. No. 02–3682 (RHK/AJB), based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED:**

1. The Motion by Defendant James Smith to Dismiss the First Amended Complaint for Lack of Personal Jurisdiction, Failure to State a Claim

---

**29.** In the alternative, Breedon asks the Court to strike improper material pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. Striking a party's pleadings, however, "is an extreme measure," and motions to strike under Rule 12(f) "are viewed with disfavor and infrequently granted." *Stanbury Law Firm,* P.A., *v. Internal Revenue Service,* 221 F.3d 1059, 1063 (8th Cir.2000) (internal quotation omitted). Because the material in the Amended Complaints is not "redundant, immaterial, impertinent, or scandalous," the Court will not strike the material under Rule 12(f).

on Which Relief Can Be Granted, and Failure to Plead Fraud with Particularity (Doc. No. 72) is **GRANTED IN PART**. Counts VI, XX, and XXII of the Amended Complaint (Doc No. 12) are **DISMISSED WITH PREJUDICE** against this Defendant;

2. The Motion by Defendant Wayne Breedon to Dismiss Plaintiff's Amended Complaint Pursuant to Fed.R.Civ.P. 8 and 12(f) (Doc. No. 103) is **DENIED**;

3. The Motion by Defendants Nomura and Nomura Canada to Dismiss the Complaint [Doc. No. 86] is **GRANTED IN PART**. Counts XX and XXII of the Amended Complaint (Doc. No. 12) are **DISMISSED WITH PREJUDICE** against these Defendants;

4. The Motion by Defendant Scott Reed to Dismiss First Amended Complaint (Doc. No. 89) is **GRANTED IN PART**. Counts XX and XXII of the Amended Complaint (Doc. No. 12) are **DISMISSED WITH PREJUDICE** against this Defendant;

5. The Motion by Deutsche Bank Defendants to Dismiss Count XXII of the Amended Complaint (Doc. No. 81) is **GRANTED**. Count XXII of the Amended Complaint is **DISMISSED WITH PREJUDICE** against these Defendants;

6. The Motion by Defendant Wayne Breedon to Dismiss Counts I, VII, XVII, XVIII, and XXII of Plaintiff's Amended Complaint (Doc. No. 105) is **GRANTED IN PART**. Count XXII of the Amended Complaint (Doc. No. 12) is **DISMISSED WITH PREJUDICE** against this Defendant;

7. The Motion to Dismiss by Defendant A.G. Edwards (Doc. No. ___) is **DENIED**;

8. The Motion by Plaintiff Ferris, Baker Watts to Strike Portions of Defendants' Nomura, Nomura Canada and Scott Reed Reply Briefs (Doc. No. 111) is **GRANTED**;

9. The Motion by Defendant Richard Evangelista for Leave to File Motion Out of Time, and for Order to Join Co–Defendants' Motions (Doc. No. 125) is **DENIED**;

In the matter of *E\*Trade Securities, LLC v. Deutsche Bank AG*, Civ. No. 02–3711 (RHK/AJB), based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED:**

1. The Motion by Defendants Deutsche Bank AG, Deutsche Securities, and Deutsche Bank SL to Dismiss Counts VII, XII, XIII, and XIV of Plaintiff's Amended Complaint (Doc. No. 71) is **MOOT**. The Amended Complaint (Doc. No. 15) is **DISMISSED WITH PREJUDICE** against these Defendants;

2. The Motion by Defendant Wayne Breedon to Dismiss Plaintiff's Amended Complaint Pursuant to Fed.R.Civ.P. 8 and 12(f) (Doc. No. 80) is **MOOT**. The Amended Complaint (Doc. No. 15) is **DISMISSED WITH PREJUDICE** against this Defendant;

3. The Motion by Defendant Wayne Breedon to Dismiss Counts I, VII, IX, X, XII, XIII, XIV, XV, and XVI of Plaintiff's Amended Complaint (Doc. No. 82) is **MOOT**. The Amended Complaint (Doc. No. 15) is **DISMISSED WITH PREJUDICE** against this Defendant;

4. The Motion by Defendant Nomura Canada to Dismiss the First Amended Complaint (Doc. No. 87) is **GRANTED IN PART**. Counts II (to the extent it alleges control of persons or entities apart from Reed),

VII, XII, XIII, XIV, and XVI of the Amended Complaint (Doc. No. 15) are **DISMISSED WITH PREJUDICE** against this Defendant;

5. The Motion by Defendant Scott Reed to Dismiss the Amended Complaint (Doc. No. 90) is **GRANTED IN PART.** Counts VII, XII, XIII, XIV, and XVI of the Amended Complaint (Doc. No. 15) are **DISMISSED WITH PREJUDICE** against this Defendant;

6. The Motion by Plaintiff E*Trade to Strike Portions of Defendants Nomura, Nomura, and Scott Reed's Reply Briefs (Doc. No. 101) is **GRANTED;**

7. The Motion by Defendant James Smith to Dismiss the Amended Complaint for Failure to State a Claim on Which Relief Can Be Granted, Lack of Personal Jurisdiction, and Failure to Plead Fraud with Particularity (Doc. No. 109) is **GRANTED IN PART.** Counts VII, XII, XIII, XIV, and XVI of the Amended Complaint (Doc. No. 15) are **DISMISSED WITH PREJUDICE** against this Defendant;

8. The Motion by Defendant Richard Evangelista for Leave to File Motion Out of Time, and for Order to Join Co–Defendants' Motions (Doc. No. 120) is **DENIED.**